**Elouise Pepion COBELL, et. al., Plaintiffs,**

v.

**Gale A. NORTON, Secretary of the Interior, et. al., Defendants.**

**No. Civ.A. 96–1285(RCL).**

United States District Court, District of Columbia.

Sept. 17, 2002.

Keith M. Harper, Lorna K. Babby, Native American Rights Fund, Dennis Marc

Gingold, Elliot H. Levitas, Kilpatrick Stockton, LLP, Washington, DC, for Plaintiffs.

Robert D. Luskin, Patton Boggs, LLP, Tom C. Clark, Brian L. Ferrell, Andrew M. Eschen, Charles Walter Findlay, III, Sarah D. Himmelhoch, Sandra Marquerite Schraibman, U.S. Dept. of Justice, Edith R. Blackwell, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, ENR Division, Annandale, VA, Lewis Steven Wiener, Sutherland, Asbill & Brennan, LLP, Mark E. Nagle, Robert Craig Lawrence, Scott Sutherland Harris, U.S. Attorney's Office, J. Christopher Kohn, JoAnn Shyloski, Barry Weiner, Henry A. Azar, Jr., U.S. Dept. of Justice, Washington, DC, Terry M. Petrie, U.S. Dept. of Justice, Denver, CO, Seth Brandon Shapiro, Jonathan Brian New, Jennifer R. Rivera, Sandra Peavler Spooner, David J. Gottesman, Peter Blaze, Miller, Cynthia L. Alexander, Mathew J. Fader, Amalia D. Kessler, John S. Most, Michael John Quinn, John J. Siemietkowski, Tracy Lyle Hilmer, Dodge Wells, U.S. Dept. of Justice, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the Court on defendants' Motion To Revoke The Appointment Of Joseph S. Kieffer, III, And To Clarify The Role And Authority Of A Court Monitor, filed June 14, 2002 ("Revocation Motion"). As the basis for the Revocation Motion, defendants claim the Court Monitor's activities in carrying out his duties pursuant to his authority under the appointment Order of this Court, dated April 16, 2001, and the reappointment Order, dated April 15, 2002, have "exceeded the constitutional and statutory limits of the Court's jurisdiction" and the authority delegated to him under those Orders. *Id.* at 1. Additionally, defendants claim that the Court Monitor has "demonstrated a lack of impartiality that requires his disqualification from further participation in this case." *Id.* Defendants also request that, if the Court determines that a continuing role for a court monitor is appropriate in this case, "the Court clarify the proper limits on the role and authority of any future court monitor ... and its previous orders regarding the role and authority of a court monitor to make them consistent with the constitutional and statutory limits on the Court's jurisdiction and to ensure in the future that the court monitor's activities will conform to these limits and to the proper role of a judicial officer." *Id.* at 1–2. Upon consideration of the memoranda filed in support or and in opposition to the defendants' motion, the record in this case, and the applicable law, the Court finds that the motion should be denied.

### I. BACKGROUND

A. *The Court Monitor Appointment Order*

On April 16, 2001, this Court, with the consent of the plaintiffs and defendants, appointed Mr. Kieffer as Court Monitor with the specific authority to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings with the Court. These reports shall include a summary of the defendants' trust reform progress and any other matter Mr. Kieffer deems pertinent to trust reform." *See* Order filed April 16, 2001 at 2. Mr. Kieffer was also "permitted to make and receive *ex parte* communications with all entities necessary or proper to effectuate his duties." *Id.* Defendants were enjoined to "assist Mr. Kieffer in the execution of his duties and responsibilities ..." and "provide Mr. Kieffer with access to any Interior offices or employees to gather information necessary or proper to fulfill his duties." *Id.*

This Court extended Mr. Kieffer's term of service as Court Monitor on April 15, 2002, pursuant to the Court's Order of April 16, 2001. *See* Order filed April 15, 2002.

### B. *Government Counsel's Consent to the Order As A Means To Lessen Litigation*

The Court placed on the public record the meetings that it had held with the parties about the Court Monitor's appointment and their consent to it on April 16, 2001, in open court. Counsel for defendants responded to the Order by stating: "Mr. Brooks: Your Honor, the government wants to put on the record that it consents to this order and appreciates the court's time and attention to this, and we hope that this will in fact be a positive step forward so that resources can be more directed towards trust reform and less directed towards litigation. And perhaps this will be a positive step between the parties as well. Thank you, Your Honor." *See* Transcript of Status Hearing, April 16, 2001, at 5.

### C. *The Secretary's Endorsement of The Court Monitor's Authority and Establishment of a Dialogue With Her Key Subordinates*

The Court Monitor met with the Secretary on April 24, 2001 and addressed his duties and responsibilities with her including the authority conveyed to him by the April 16, 2001 Order. On that same day, the Secretary issued a memorandum to all employees of the Department of the Interior that repeated the Order's grant of the Court Monitor's authority including that he was permitted to make and receive *ex parte* communications with all entities necessary or proper to effectuate his duties. The Secretary notified all of her employees that Mr. Kieffer "must be provided access to records and documents of the Department, its bureaus and offices, as well as to any officer and employee of the Department and to any of its offices, bureaus or contractors that he deems necessary for the accomplishment of his duties...." [1]

The Secretary also assigned her Counselor, Michael Rossetti, to meet with Mr. Kieffer so that any concerns of the Court Monitor could be conveyed to the Secretary in order that she might address them and avoid the necessity of the Court Monitor later making a report to this Court about those concerns. This dialogue first took place with Mr. Rossetti during the spring of 2001, as the Court Monitor reviewed the defendants' efforts (or lack thereof) to conduct a historical accounting project.

### D. *The Deputy Secretary's Request For a Renewed Dialogue*

In his declaration, The Deputy Secretary speaks of requesting the Court Monitor to meet with him and the Special Trustee on April 19, 2002 to discuss concerns about the role of the Special Trustee and his office. *See* Declaration of J. Steven Griles, June 4, 2002 at 1. To read Mr. Griles' declaration, it would appear that this was the first time that Mr. Griles ever requested the Court Monitor to meet with him and his subordinates at the Interior Department. In this regard, the Deputy Secretary's declaration exhibits an alarming lack of candor and comes perilously close to perjury by omission. [2] The Deputy

---

1. *See* Secretary of the Interior memorandum, dated April 24, 2001, entitled, "Appointment of Joseph S. Kieffer, III." at Exhibit 2, *Plaintiffs' Motion For Order To Show Cause Why Interior Defendants, And Their Senior Managers And Counsel Should Not Be Held In Civil Contempt For Violating The Court's April 16, 2001 And April 15, 2002 Orders, at 1–2.*

2. That the Department of Justice would allow the Deputy Secretary's declaration to so glaringly omit any mention of the substance and

Secretary knows that this Court was aware of the Deputy Secretary's oral request on November 1, 2001, on behalf of the Secretary, made to the Court Monitor, to begin a dialogue with the Deputy Secretary and his senior subordinates with the *express* authorization of this Court. The meetings were for the Deputy Secretary to address the concerns of the Court Monitor and resolve them to further trust reform without the need to involve the parties in additional litigation. Also, their purpose was to alleviate the need for the Court Monitor to submit further Reports to the Court unless the Deputy Secretary could not or would not correct the issues giving rise to those concerns. The Deputy Secretary is also aware that dialogue, once authorized by this Court on that same date, with the understanding that the defendants' counsel had agreed to this *ex parte* contact between the Deputy Secretary, his key subordinates, and the Court Monitor, began that evening and continued on a regular basis with him and his key subordinates, the Associate Deputy Secretary, Mr. James Cason, and the Director of Indian Trust Transition, Mr. Ross Swimmer, for a period of over six months including the April 19, 2002 meeting with the Special Trustee and his Principal Deputy, Mr. Tommy Thompson (by conference phone). That dialogue continued for two meetings following the April 19, 2002 meeting until shortly after the submission of the Seventh Report of the Court Monitor ("Seventh Report").

E. *The Extent of the Dialogue Between the Deputy Secretary and the Court Monitor*

The Court Monitor's attendance at the April 19, 2002 meeting was not an isolated event. Even a cursory review of the invoice summaries submitted by the Court Monitor demonstrate that there had been numerous meetings between the Deputy Secretary and the Court Monitor. The invoice summaries even provide the date and time the Court Monitor spent with the Deputy Secretary and his key subordinates during a six month time period.[3] The Court Monitor met with Mr. Griles on at least *twenty* occasions for approximately thirty hours. While it is not the Court's intention to compound the violation of the confidential *ex parte* nature of these discussions (as was done by the Deputy Secretary and his subordinates when they filed their declarations), suffice it to say that those discussions, reported to this Court by the Court Monitor, ranged far and wide on the trust reform efforts of Mr. Griles, as the Secretary's appointed "man in charge" of trust reform. As with Mr. Rossetti, the Court Monitor, at the request of the Deputy Secretary, described the reviews he conducted of the progress of trust reform and the historical accounting and answered all questions posed by the

six month duration of the meetings between the Court Monitor and the Deputy Secretary, to include those that followed the April 19, 2002 meeting, or this Court's authorization of them, is a renewed example of the improper conduct of the government attorneys who have represented the defendants in this litigation. Two sets of Department of Justice attorneys have been dismissed during the course of this litigation for conduct involving matters addressed in the two contempt trials held by this Court. Now a third set of government attorneys have either failed to make appropri-

ate inquiries and conduct the requisite due diligence in documenting their justification for the revocation of the appointment of the Court Monitor or have suppressed their knowledge of the truth.

3. *See* Plaintiffs' Consolidated Opposition To Interior Defendants' Motion To Revoke The Appointment Of Joseph S. Kieffer, III And To Clarify The Role Of Court Monitor And Opposition To Defendants' Motion To Not Pay Mr. Kieffer's Fees at Plaintiffs Exhibit 1, page 28.

Deputy Secretary and his key subordinates about their plans and operations regarding these matters. While not specifically identifying the subject matter of those discussions here, the Court was aware that they involved matters that later became the subject of the Court Monitor's Fifth (the historical accounting), Sixth (the Eighth Quarterly Report), and Seventh (the Special Trustee) Reports to the Court. Also during this same period, the Secretary's proposed Bureau of Indian Trust Asset Management (BITAM) was under formation and review at Interior and was and is also a subject of the Court Monitor's continuing review.

That the Deputy Secretary wanted this dialogue outside of the prying eyes of the Court or, of more concern, the plaintiffs, and reiterated his interest in it is no better exemplified than in his own testimony during the contempt trial of the Secretary and Assistant Secretary for Indian Affairs in February 2002. During his testimony, this Court inquired of the Deputy Secretary just how outsiders could monitor trust reform within the DOI and referred to the Court Monitor's role. Mr. Griles responded:

> ... I think that we would rather not be in an adversarial role with the Court Monitor. If he has got concerns, let me know what they are and if I can't fix them and resolve them and he thinks he's not getting the facts, tell me what they are. I will deal with them.
>
> What we end up doing is having to respond to the Court Monitor's report because the next thing we know, we will have somebody in contempt of court. That's not in the best interest of you, the Department and of the Court Monitor. And so that's our frustration, I guess, with the process.

Contempt II Tr. at 4179–4180.

Mr. Griles was fully aware at the time of his testimony that this Court had already authorized, at his request, the Court Monitor to do exactly what he wanted: tell him of the Court Monitor's concerns and what the Court Monitor planned to report to this Court about those concerns so that Mr. Griles could address and correct the perceived problem or resolve the Court Monitor's concerns.[4]

## II. ANALYSIS

 The discretion of this Court in considering the sufficiency of a motion to recuse a judicial officer pursuant to 28 U.S.C. Section 455(a), such as the instant motion regarding the alleged actions of the

---

4. Defendants argue in their *Reply To Plaintiffs' Opposition To Interior Defendants' Motion To Revoke The Appointment of Joseph S. Kieffer, III, And To Clarify The Role And Authority Of A Court Monitor,* filed July 11, 2002, that the Deputy Secretary, by making this request, only wanted Mr. Kieffer to inform him of his concerns prior to filing his reports so that "Mr. Griles and other Interior officials could help him" and address those concerns themselves; that the Deputy Secretary did not expect the Court Monitor to "employ his position as a judicial officer as a means with which to dictate how the Department of the Interior should be run." *Id.* at 9. Defendants seek to limit the intent of the Deputy Secretary's request made of this Court and expand the conduct of the Court Monitor beyond any role he sought to carry out or did conduct. For over six months the Court Monitor advised the Deputy Secretary of his concerns and the potential substance of his reports regarding his opinion of the status of defendants' trust reform efforts at the *specific* and *continuing* request of the Deputy Secretary. For over six months, including meetings and conversations following the April 19, 2002 meeting, the Deputy Secretary listened to that advice and even thanked the Court Monitor for it. For defendants to attempt to characterize the advice of the Court Monitor as judicial dictates in one of the last meetings during these six months of meetings (which they fail to address at all) would be farcical if it were not so cynical.

Court Monitor, is broad. *See James v. District of Columbia,* 191 F.Supp.2d 44 at 46–47 (D.D.C.2002). Defendants bear the burden of proof to show that the Court Monitor has conducted himself in a manner supporting his disqualification. The Court must begin its analysis of the allegations supporting such a request with a presumption against disqualification. *See Tripp v. Executive Office of the President,* 104 F.Supp.2d 30 (D.D.C.2000); *McCann v. Communications Design Corp.,* 775 F.Supp. 1506 (D.Conn.1991).

The Court finds that the defendants have failed to meet their burden of proof and overcome the presumption against disqualification of Mr. Kieffer. As more fully addressed below, the Court Monitor's activities questioned by the defendants were not inappropriate or beyond his authority. To the contrary, those activities addressed in the declarations relied on by defendants were conducted pursuant to the Secretary of the Interior's *own request* to this Court that the Court Monitor inform her through the Deputy Secretary of his concerns with the progress of trust reform and the ongoing activities of defendants to bring about that reform. It was the Deputy Secretary himself who requested the Court Monitor be permitted to engage in a dialogue with him and his senior managers regarding his interest and that of the Secretary in learning of the opinions and concerns of the Court Monitor regarding actions taken by Defendants to bring about both the historical accounting and trust reform or what has become known as "fixing the system."

As the Court Monitor has conducted his activities in conformance with the Orders of the Court, there is no cause for this Court to revoke the Court Monitor's appointment. In light of the Memorandum Opinion issued this date regarding the five civil contempt specifications, the remaining issues raised by defendants in their motion are now moot. Accordingly, the Court will not address them.

A. *The April 19, 2002 Meeting*

■ The peg on which defendants seek to hang their motion to revoke the appointment of the Court Monitor is that his conduct, mainly at the April 19, 2002 meeting, was an assumption of powers that exceeded in some manner his authority and the constitutional and statutory bounds of the jurisdiction of this Court. Defendants contend that his words to them during the meeting prove that the Court Monitor sought to exercise control over the Interior Department to bend it to his (or, inferentially, this Court's) will. In their words, he had attempted to influence improperly the parties to the meeting; had issued an "ultimatum" to the defendants; had "chosen sides" with the Special Trustee; and threatened that if they did not follow his direction, they would suffer "unpleasant consequences" including the publication of the "Seventh Report criticizing their treatment of the Special Trustee." *See* Revocation Motion at 8.

The declarations on which these allegations are based utterly fail to report accurately the facts surrounding the reason the Deputy Secretary requested the Court Monitor's attendance at this meeting, the circumstances under which he was authorized by this Court to participate in the meeting, and the reasons for the continuing dialogue about the Special Trustee that was held with the Deputy Secretary before, during, and after the meeting. Once again, as he had done at the beginning of the dialogue between the Deputy Secretary and the Court Monitor that started in November 2001, the Deputy Secretary requested that this Court authorize the Court Monitor's attendance at this meeting; a fact completely unreported in his description of the meeting and the reasons

for it. This was not the first meeting with the Deputy Secretary at which the Court Monitor had addressed his concerns regarding the ongoing dispute between the Secretary, the Deputy Secretary, and the Special Trustee about the latter's reporting channels, alleged performance failures, professional concerns about the progress of trust reform, the strategic plan, and the inability of the defendants to conduct a proper historical accounting. To the contrary, the Court Monitor had informed the Deputy Secretary, as he later stated in the Seventh Report, that this Court had expressed interest in knowing of the role that the Special Trustee would play in the Secretary's planned reorganization of the Department of the Interior under the BITAM proposal. For that reason, if no other, the Court Monitor would be reporting on the Special Trustee's ongoing role in overseeing and advising the Secretary on trust reform carried out under the direction of the Deputy Secretary.

This Court has given serious consideration to hearing testimony on the instant motion to include that of the Court Monitor and the former Special Trustee to fully document the six month history of meetings between the Court Monitor and the Deputy Secretary, always at the latter's request, and the uses to which the Deputy Secretary may have improperly attempted to bend the good will efforts of the Court Monitor to defendants' own benefit. However, the Court is personally aware of the background of the April 19, 2002 meeting, the conversations at that meeting and at the subsequent meetings between the Deputy Secretary and the Court Monitor. Contemporaneous reports by the Court Monitor to the Court and the public record are sufficient to avoid the necessity of lifting the *ex parte* veil from these meetings any further than it has been torn by the words of the Deputy Secretary in his declaration and those of his subordinates in theirs.

There is a simple truth regarding the Court Monitor's participation in and presentation at this meeting. In several meetings prior to the April 19, 2002 meeting, the Court Monitor apprised the Deputy Secretary that there was a dispute developing between the Secretary and the Special Trustee (with a central role being played by the Deputy Secretary in threatening to fire the Special Trustee) regarding the appropriate role of the Special Trustee. The Court Monitor had also alerted the Deputy Secretary that he had planned, before learning of this dispute, to submit a Report of his review of the Special Trustee's role in the trust reorganization underway within the Interior Department. That review would have to include this dispute if it were not resolved. The Deputy Secretary was the person that requested the Court Monitor meet with both the Special Trustee and him to discuss the issue.

B. *Court Authorization For The Court Monitor To Attend And Participate In The April 19, 2002 Meeting*

The Court is aware of the substance of these meetings concerning the Special Trustee and of the meeting held by the Deputy Secretary with the Court Monitor the day before the April 19, 2002 meeting. The Court Monitor had agreed to attend the latter meeting at the request of the Deputy Secretary *only* if this Court authorized that attendance and approved the role the Deputy Secretary asked the Court Monitor to undertake during the April 18, 2002 meeting. Based on a review with the Court Monitor of the presentation of the facts surrounding the request of the Deputy Secretary at the prior meeting, his pledge to honor the previous *ex parte* agreement with the Court Monitor, and that he would provide notice to and receive agreement from defendants' counsel that the meeting could take place in the man-

ner requested, without the attendance of counsel, this Court authorized the Court Monitor to honor the Deputy Secretary's request and attend and participate in the meeting.

The Court Monitor did not have an improper role at the April 19, 2002 meeting attended by the Deputy Secretary and the Special Trustee (and their subordinates). Indeed, the role of the Court Monitor at that meeting was one that was requested by the Deputy Secretary and authorized by this Court. By all accounts, it was a heated meeting and resolved nothing. As subsequently reported by the Court Monitor in the Seventh Report, defendants were unwilling to fully accept the Congressionally-mandated role of the Special Trustee whose main responsibility was to oversee and report to Congress and advise the Secretary on the status of, problems with, and solutions to the Interior Department's trust reform activities.

This Court was aware that this April 19, 2002 meeting was another meeting in a series of meetings, both before and after it, at which the Court Monitor expressed his concerns to the Deputy Secretary about the actions of the Secretary and the Deputy Secretary regarding the Special Trustee as the Deputy Secretary had requested him to do. The only difference with this meeting was the presence of the Special Trustee and his Principal Deputy and the objective of the meeting as established by the Deputy Secretary. Defendants have attempted to portray the purpose of the role and objectives of the Court Monitor during this meeting into something other than what they were.

What is most troubling to the Court about the defendants' motion and attached declarations is that they have taken a good faith effort on the part of this Court to provide a unique opportunity to the Secretary of the Interior, at her request, and twisted that effort into an inappropriate

and unwarranted attack on the Court Monitor and, undeniably, this Court. The Court sought to allow the defendants to receive the benefit of the views of the Court's own monitor prior to his reporting publicly about them to this Court. The Secretary's request to receive the advice of the Court Monitor about his review of defendants' trust reform planning and operations, as relayed to the Court by the Deputy Secretary in November 2001, was believed by this Court to be worth granting if any further failures or delays in the Secretary's trust reform efforts could be corrected or avoided for the benefit of the defendants' trust reform efforts, the plaintiffs, and, indirectly, all Indian Trust beneficiaries.

The results of granting the Secretary's request and allowing the Court Monitor to hold a six-month *ex parte* dialogue with the Deputy Secretary and his subordinates are typified by the disingenuous compilation of allegations against the Court Monitor concerning his conduct at one of these meetings. Defendants' unsuccessful attempt to discredit the Court Monitor similar to so many of the defendants' trust reform Quarterly Reports, fails of its own mendacity. Defendants waited until the very last moment after a six-month dialogue between the Court Monitor and the Deputy Secretary to claim that the Court Monitor's conduct at one meeting of over twenty hour-plus meetings was inappropriate and beyond his authority.

Having failed to address these meetings or their involvement in initiating them, defendants will not now be heard to claim the role of the Court Monitor was anything other than what the Deputy Secretary stated he wanted it to be in November 2001 and later in April 2002 at the time of the subject meeting. The declarations' descriptions of the Court Monitor's statements, whether actually made, taken out of

context, or invented, when placed in the proper context of the purpose of the meeting called by the Deputy Secretary, reveal no more than the efforts of the Court Monitor to apprise the Deputy Secretary in the presence of the Special Trustee of the obvious risks faced by the defendants in this litigation and the additional concerns he had regarding the Secretary's disagreements with the Special Trustee's opinion of the status of trust reform and the Special Trustee's own role to oversee, report on, and correct it. His presentation and comments appear to be an effort to set the stage to convince the parties attending the meeting to find some way to work together rather than continue the internecine warfare patently obvious in their own dueling memoranda included with the Seventh Report of the Court Monitor.[5]

That the Deputy Secretary continued to meet with the Court Monitor and discuss the issues surrounding the Special Trustee *after* the April 19, 2002 meeting, also unreported by Mr. Griles in his declaration, weighs against attaching any weight to the veracity of the Deputy Secretary's declaration.

Although the Court Monitor was able to accomplish little as he sought to apprise the Secretary and Deputy Secretary of his concerns to enable them to better carry out defendants' trust reform fiduciary obligations during the six months the Court Monitor assented to the Deputy Secretary's requests, the Court Monitor's efforts appear to be honorable, well-intentioned, and always at the direct request[6] of the Deputy Secretary. The Court Monitor's conduct appears to the Court to have been professional, appropriate, and within his

5. The Office of the Inspector General, Department of the Interior, has reported on this warfare in its *Report: Allegation Concerning Conduct of Department of the Interior Employees Involved in Various Aspects of the Cobell Litigation*, submitted by defendants to this Court. *See* Defendants' Notice of Filing, August 5, 2002. In the Executive Summary to that Report, the Office of the Inspector General noted in its Conclusion: "Having had oversight responsibility for more than two decades, the Office of Inspector General benefits from having a unique historical perspective of the Department as an institution. During our years of oversight, we have often observed that the components of the Department have no history of, and no particular incentive to, work together." *Id.* at 6. Further, "The Office of Inspector General has seen this 'bunker mentality' display itself time and again. The pattern here is the same—begin by protecting one's own Bureau or office, to the detriment of other Bureaus or offices if necessary; then protect the Department, and/or the institution or position it has advanced; finally, protect the public interests for which the Department is responsible, in this case those of Individual Indian Trust account holders." *Id.* And, finally, with respect to the Office of Special Trustee and the Bureau of Indian Affairs: "Finally, the friction between BIA and OST is

particularly noteworthy. So long as it continues, we fear little meaningful progress will be made in the arena of Indian Trust reform." *Id.*

6. Assuming, as the Court does for the purposes of this motion, that, as the April 19, 2002 meeting was about to commence, the Deputy Secretary asked that it be cancelled, any statement made by the Court Monitor that it would be in the defendants' interests not to cancel is understandable. The Court Monitor had just obtained the day before this Court's authorization at the request of the Deputy Secretary to attend the meeting and attempt to facilitate a resolution of the continuing dispute between the Secretary, the Deputy Secretary, and the Special Trustee to obviate the necessity of filing a Report addressing this major stumbling block facing the Secretary in her efforts to make progress with trust reform. In light of the major problems facing the defendants in their trust reform efforts that had been observed by the Court Monitor over the period of his meetings with the Deputy Secretary, one more example of the defendants' unwillingness to work out one of their major problems regarding the Special Trustee's role and opinions regarding the lack of trust reform progress would have given this Court another example of that recalcitrance.

authority granted by this Court. His specific involvement at the April 19, 2002 meeting was based on the authorization of this Court on April 18, 2002—at the specific oral request of the Deputy Secretary. That the Deputy Secretary chose to waste this unique opportunity to have the benefit of this *ex parte* dialogue with the Court Monitor, having fervently requested it from this Court; and to characterize it as something it was not is stark testimony to the defendants' lack of integrity brought by them to not only their legal and ethical obligations to this Court but to their conduct of their fiduciary obligations to the American Indian and specifically the IIM account holders, the plaintiffs in this litigation.

### C. *Other Allegations Of Misconduct*

#### 1. *The Seventh Report*

█ Defendants attempt to cobble together an argument that the Seventh Report, that mainly addresses the correspondence between the Secretary and the Special Trustee highlighting the inability of the Secretary, or her advisors, to understand or appreciate the role of the Special Trustee, intruded on the internal affairs of the defendants rather than just report on the Interior's trust reform activities. *See* Motion in Support of Revocation Motion at 13. In making this argument, defendants overlook the role of the Special Trustee as established by Congress in the Indian Trust Fund Management Act of 1994. See Pub.L. No. 103–412 (1994) (1994 Act). The position of Special Trustee was established, as this Court stated in its December 21, 1999 Memorandum Opinion: "Because Congress recognized that Interior's pattern of historic failures could not be allowed to continue, the (1994 Act) established within the Interior the Office of the Special Trustee for American Indians. To advise the Secretary and to help oversee defen-

dants' trust management practices ..." *Cobell v. Babbitt*, 91 F.Supp.2d 1, 13 (D.D.C.1999). Reporting on the role played, or not played, by the Special Trustee clearly fell within the appointment order of the Court Monitor.

The Court Monitor's review and the Seventh Report addressed the role given, or not given, to the Special Trustee by the Secretary and the Special Trustee's concerns about this role and his inability to perform his proper functions assigned to him by Congress. This Court wanted to know, as it attempted to determine during the Secretary's contempt trial without success, what the Secretary planned to do to ensure that the Special Trustee was appropriately involved in the planned reorganization and that she and the Congress had unfettered access to the candid and unobstructed advice and opinions of the Special Trustee through his oversight responsibilities. The Special Trustee is no longer with us to give Congress and this Court those opinions. But the Seventh Report documented his recent concerns about the lack of trust reform progress and his belief that the defendants could not conduct an adequate and complete historical trust accounting and the potential reasons why he may no longer be among the participants in the defendants' trust reform efforts.

#### 2. *Task Force on Management Reform–Tribal Task Force Meeting, May 20, 2002*

█ The defendants also portray the Court Monitor's attendance and limited participation in the meetings of the Tribal Task Force as somehow offering himself as a "fact witness" biased in favor of the Special Trustee and against the Secretary and her immediate staff. *See* Memorandum in Support of Revocation Motion at 20–21.

The Court Monitor's attendance at the Tribal Task Force meetings was and is within his authority to monitor the progress of trust reform. The defendants announced to this Court in November 2001, with much fanfare, that they were in the process of reorganizing the Interior Department to create a trust organization separate and apart from the Bureau of Indian Affairs (BIA)—The Bureau of Trust Asset Management (BITAM). BITAM, not unlike TAAMS before it, touted by the last Interior Department administration as the panacea for trust reform, was the response of the defendants to not only the reports of the Court Monitor but also of their own contractor—Electronic Data Systems—who reviewed the trust reform efforts of the BIA and reported their failures and needed corrections in a series of reports that defendants submitted to this Court.

Recently, in their *Status Report to the Court Number Ten,* at page 5, defendants have informed this Court that, not unlike the TAAMS initiative, this Secretary has withdrawn the BITAM proposal as a means for carrying out the fiduciary trust obligations of defendants. What oversight and supervisory organizations and fiduciary trust structures will be created in its place? There is no strategic plan, no trust organization, and no business, computer, or personnel management systems to carry out trust reform or conduct sound fiduciary trust operations. Defendants are still attempting to determine what they are doing presently about trust reform and trust operations nationwide. Consultation with the Indian Tribes represented by the Tribal Task Force is now the focus of the trust reform reorganization. Whether this consultation process will result in a new trust organization that can meet the fiduciary trust standards required of defendants is questionable at this time and remains unanswered by defendants. The Court Monitor has appropriately attended these meetings and observed their progress to be able to address these questions and many others with the defendants' employees and Tribal representatives involved in these monthly consultations. Indeed, Secretary Norton herself raised this issue during the contempt trial.

The Court Monitor has presented an update of his activities to the Tribal Task Force membership at their leadership's request at each meeting he has attended. To read portions of his Reports to the Court to the membership or comment on those reports and the activities of the defendants described in them is not a showing of bias but an expression of his opinions well documented in his reports to this Court. It appears that any negative comments about defendants' activities or even positive comments about the Secretary's subordinates, if expressed by the Court Monitor, will be interpreted by defendants as bias with some convoluted interpretation of their factual significance or legal effect upon the litigation. Defendants, in their efforts to discredit the Court Monitor, are grabbing at factual straws and legal sparks in a fruitless attempt to make a disqualification bonfire.

### 3. *The Seventh Report's Release of "Privileged" Documents*

Defendants claim privilege over six documents submitted by the Court Monitor in his Seventh Report. They allege that he, in some manner, has violated defendants' fundamental right to communicate with their counsel by releasing these alleged privileged documents. The Court Monitor obtained these documents from DOI officials pursuant to his authority under Court Orders and the Secretary's own memorandum's direction. No claim of privilege accompanied that release or he would have so indicated to this Court. Whether or not these officials failed to

 

properly advise the Court Monitor of any privilege they believed might attach to any of the documents is of no moment in answering the allegation that the Court Monitor has acted improperly in publicly releasing them. The Court Monitor included and discussed some of these documents and others in his Seventh Report to the Court. The Court Monitor obtained them pursuant to this Court's Orders appointing him to his position. The Secretary, in her April 24, 2001 memorandum, announcing the appointment of the Court Monitor, had also directed that the Court Monitor have access to all records within her control. It was the defendants' duty to properly advise the Court Monitor of any claims of privilege. They do not appear to have done so.

The Court also notes that the Special Master has held that the attorney/client and deliberative process privileges and work-product doctrine cannot be asserted by a trustee to shield disclosure from trust beneficiaries information regarding the management and administration of the trust. Defendants have not contested that decision before this Court. *See Opinion of Special Master,* dated May 11, 1999, at 10–11.

### III. CONCLUSION

Defendants have sought the Court Monitor's disqualification pursuant to 28 U.S.C. Section 455(a), which states: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Defendants have failed to meet that standard in their unwarranted and meretricious allegations against the Court Monitor. Accordingly, it is hereby

ORDERED that the defendants' Motion To Revoke The Appointment Of Joseph S. Kieffer, III, And To Clarify The Role And Authority Of A Court Monitor [1339–1] [1339–2] is DENIED.

SO ORDERED.