**Merle R. JENKINS, et al.**

v.

**Michael A. STERLACCI, Appellant.**

**No. 87–7108.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 18, 1988.

Decided June 10, 1988.

As Amended June 21, 1988.

Opinion on Denial of Rehearing Sept. 6, 1988.

Raymond D. Battocchi, Washington, D.C., for appellant.

James R. Treese, Alexandria, Va., for appellees.

Before WILLIAMS, D.H. GINSBURG, and BOGGS,* Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The question raised by this appeal is whether the district court properly denied appellant's motion to disqualify a special master who, while preparing a report in this case, represented a client in an unrelated proceeding in which a member of

* Of the U.S. Court of Appeals for the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

the law firm representing appellant served as opposing counsel. In order to resolve this question, we must assay the degree to which each member of a law firm is charged with knowledge about the activities of every other member of the firm, the ethical responsibilities of a special master, and the standards to be applied by the district court in addressing a motion to disqualify a special master.

## I. BACKGROUND

The underlying dispute in this case arises from the souring of relations among attorneys who had been in partnership. In 1977, the appellant, Michael Sterlacci, and the appellees, Merle Jenkins and Dennis Nystrom, agreed to form a partnership to practice law in Washington, D.C. At the time, Nystrom and Jenkins were principals in a law firm headquartered in Southfield, Michigan. The parties agreed that Sterlacci would assume management responsibilities in the Washington office; it was further agreed that he would not play an active role in the legal or managerial affairs of the Michigan office. Administration of the firm was centralized at the Michigan office, which maintained the accounting records of, and paid bills pertaining to, the Washington office. Attorneys practicing out of the Washington office billed their clients directly, but all fees were to be sent to the Michigan office for deposit in a separate account maintained there for the Washington office. The Michigan office generated monthly profit and loss statements for the Washington office.

In December 1981, the parties agreed to close the Washington office after the Michigan partners determined that it was not a promising business venture. A series of financial disputes between the parties, however, prevented the immediate dissolution of the partnership. Unable to negotiate an acceptable distribution of the partnership assets, Nystrom and Jenkins filed suit against Sterlacci in the District of Columbia Superior Court, alleging *inter alia,* breach of contract and breach of fiduciary duties. Sterlacci removed the action to the district court, invoking its diversity jurisdiction, and counterclaimed in kind.

The district court found that Jenkins and Nystrom were liable for breach of contract to the extent that they failed to implement an agreed-upon compensation formula. The court also found that they breached their fiduciary duties by failing to abide by this formula in their bookkeeping practices. Sterlacci admitted that he had diverted fees from the Washington office's billings into a local money market account he maintained with a colleague from that office.

The court ordered that a special master be selected under the Commercial Arbitration Rules of the American Arbitration Association, and charged the special master with determining the damages owing to the respective parties. Professor Harold C. Petrowitz of American University was appointed special master. In all proceedings before the district court and the special master, Sterlacci was represented by Raymond D. Battocchi, a member of the law firm of Cole and Groner, P.C.

We now draw our attention closely to the chronology of the end-game. Evidentiary proceedings before the special master were concluded on April 7, 1986; closing briefs were filed on April 23, 1986. On May 2, 1986, with the Sterlacci matter still before him for decision, special master Petrowitz, acting as an attorney on behalf of Radalab, Inc., filed an unrelated administrative appeal with the Office of Hearings and Appeals of the Small Business Administration ("SBA"). Radalab's appeal challenged a determination that bore significantly on the success of Accusonics Systems, Inc. in securing a government contract. On May 9, 1986, therefore, Walter Fleischer notified the SBA that he represented Accusonics, and that his client wanted to participate as an interested party in Radalab's appeal. The cases were no longer unrelated, for Walter Fleischer is a member of Cole and Groner, P.C.

On May 22, 1986, Fleischer filed a brief with the SBA opposing Radalab's appeal. Petrowitz filed a response to Fleischer's brief, concluding that "[t]he kindest description that can be accorded [Fleischer's

brief], riddled as it is with inaccuracies and specious assertions, is 'unprofessional.'" On June 13, 1986, the SBA rejected Radalab's appeal; whatever the merits of Fleischer's brief, his position prevailed over that of attorney Petrowitz.

On July 15, 1986, special master Petrowitz submitted his report in the *Sterlacci* case to the American Arbitration Association. Sterlacci's counsel received the report the following day. On July 24, 1986, Sterlacci moved the district court to disqualify the special master and to vacate his report, alleging that Petrowitz's participation as an attorney in the SBA proceeding raised reasonable doubts about his impartiality as a special master in this case, and that his report demonstrated that actual bias had infected his consideration of the damages issues.

Responding to this motion, the special master "strongly recommend[ed] that the motion be denied," providing three reasons: (1) the special master could not have known that a member of Cole and Groner was involved in the SBA proceeding until after the initial pleadings had been filed; (2) once he became aware of Cole and Groner's role in the SBA appeal, he "assumed with complete justification that all partners in the law firm of Sterlacci's counsel would be aware of his [i.e., Petrowitz's] participation in" the *Sterlacci* case; and (3) the motion to disqualify was not filed until after his report had issued, raising "[t]he inescapable inference ... that [Sterlacci] and his counsel [were] dissatisfied with the Report ... and [used] an entirely fortuitous circumstance as a basis for avoiding whatever consequences the Report might have."

The district court denied the motion to disqualify, concluding that there was "no indication of bias and no reason to disqualify the master." *Jenkins v. Sterlacci,* C.A.

No. 82–2010, Order at 4 (D.D.C. Dec. 16, 1986) (citing *Morgan v. Kerrigan,* 530 F.2d 401, 426 (1st Cir.1976)). Sterlacci appealed.

## II. APPEARANCE OF PARTIALITY

■ The American Bar Association Code of Judicial Conduct for United States Judges, which was approved by the Judicial Conference of the United States, directs a judge to "disqualify himself in any proceeding in which his impartially might reasonably be questioned." CODE OF JUDICIAL CONDUCT FOR UNITED STATES JUDGES Canon 3.C(1); *see also* 28 U.S.C. § 455(a) (same standard applicable to "any justice, judge, or magistrate of the United States"). The Code further provides that "[a]nyone ... who is an officer of a judicial system performing judicial functions, including an officer such as a ... special master ... is a judge for the purpose of this Code." *Id.* at I–58. Plainly, then, special master Petrowitz was obligated to disqualify himself in this case *if,* as Sterlacci argues, his participation might reasonably be regarded as raising the specter of partiality, *unless,* as Jenkins and Nystrom suggest, the parties effectively waived their objection. *See id.* Canon 3.D, *compare* 28 U.S.C. § 455(e) (parties may waive disqualification of judge based on appearance of partiality standard of § 455(a)); *see United States v. Murphy,* 768 F.2d 1518, 1540 (7th Cir.1985).

### A. *Standard Applied to Special Masters*

■ The appellees argue that special masters should be held to a lesser standard of conduct than judges because they are subject to "control" by the district court.[1] Within the framework of the Code, we take this argument to mean that a special master's impartiality cannot as readily be questioned, by virtue of the district court's supervision—in anticipation of which the mas-

---

1. In *Morgan v. Kerrigan,* 530 F.2d 401, 426 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), the First Circuit stated:

   Since special masters ... are subject to the control of the court and since there is a need to hire individuals with expertise in particular subject matters, masters ... have not been held to the strict standard of impartiality that are applied to judges.

For the reasons stated in the text, we find this reasoning unpersuasive; we believe that, at least insofar as special masters perform duties functionally equivalent to those performed by a judge, they must be held to the same standards as judges for purposes of disqualification.

ter would keep to the straight and narrow path. As we explain more fully below, the district court's oversight of the special master may indeed be important in cases where actual bias is alleged to have tainted proceedings before the special master. We cannot agree, however, that the control over the special master that a district court exercises is a sufficient basis for holding special masters to a lesser standard of conduct. As the Supreme Court has stated:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *see also Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974) ("[T]he inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' ") (quoting *Ungar v. Sarafite,* 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)).

It is this prophylactic protection against bias on the part of "[a]ny one ... performing judicial functions," expressly including special masters, that Canon 3.C(1) of the Code of Judicial Conduct is designed to achieve. The court's interest in the administration of justice, and the public's confidence in the fairness of our judicial system, require no less. We would disserve both causes were we to suggest that some lesser standard may appropriately be applied to special masters by virtue of an imprecise, indeed merely probabilistic, assessment of the effectiveness that district court oversight of a special master's findings may entail.

The circumstances of this case, which is altogether typical of many cases in which a special master is used, expose the danger of such an approach. Here, a special master was appointed by the district court to assist it in the laborious task of determining the amounts owing to the respective parties from the partnership for the practice of law. Apparently in order to enlist the expertise of an individual familiar with such matters, the court specified that the master, to be chosen by the American Arbitration Association, be a lawyer. That expertise was enlisted in this case to help the court resolve three specific factual disputes: (1) the cumulative net profit of the Washington office; (2) the amount of that profit that Jenkins and Nystrom had already received; and (3) the distribution of partnership assets deposited in the registry of the district court during the pendency of the litigation. *Sterlacci, supra,* Mem.Op. at 10 (D.D.C. June 21, 1984). The special master's factual findings on these issues were reviewed by the district court only for "clear error," as required by Rule 53(e)(2) of the Federal Rules of Civil Procedure. In the face of conflicting evidence, the "clear error" standard insulates a special master's findings from reversal by the district court unless that court "is left with the definite and firm conviction that a mistake has been committed." *Oil, Chemical and Atomic Workers Int'l Union v. NLRB,* 547 F.2d 575, 580 (D.C.Cir.1976) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Thus, even though a special master's findings may go against what the district court and this court believe to be the weight of the evidence, those findings may nonetheless be upheld. *Id.* In this respect, the special master occupies a position functionally indistinguishable from that of a trial judge.

■ Given the complexities of the issues special masters are frequently called upon to sort out, the closely disputed issues of fact they must resolve in the first instance, and the "clear error" standard governing the court's review of their findings, the district court's oversight of a special master falls far short of plenary "control"; there is a range within which a special master's partiality may operate unchecked and uncheckable by the district court. For that reason, it is the special master who must, in the first instance, confront and consider—sensitively and thoroughly—

whether personal, professional, financial, or social relationships may so infect his consideration of a case as to create genuine issues about his ability impartially to resolve close and difficult questions of fact. *Cf. Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1301 (D.C.Cir.1988) (noting that a judge's assessment of his own impartiality or the possible appearance of impropriety "is not a decision that an appellate panel may make for a district court judge in the first instance.").[2]  In considering questions of disqualification in situations where a special master's impartiality is called into question, we hold that the special master must hold himself to the same high standards applicable to the conduct of judges. *See United States v. Conservation Chemical Co.,* 106 F.R.D. 210, 234 (W.D.Mo.1985).

■ We do recognize, however, that unlike judges, special masters are often practicing attorneys.  They therefore may wear different hats depending upon the professional function they are performing from one day to the next.  In one matter they may be required to observe the impartial decorum of a decisionmaker, while in another they may be called upon to assume the perspective, and the partiality, of an advocate.  This duality of roles places a burden on the special master with an active law practice, but its discharge does not require that once he has accepted an assignment as a special master, an attorney place his life as an advocate in a state of suspended animation.  Such a requirement would be counterproductive, since many of the best qualified candidates would certainly forego service as a special master if, during that service, they were required to forego completely their private practice.  Instead, it is sufficient, and necessary, that an individual who accepts an appointment as a special master scrupulously avoid any undertaking, as an advocate or otherwise, that would tend or appear to compromise his impartiality as a decisionmaker.

2. As we explain below, the untimeliness of the motion to disqualify and the unique circumstances of this case effectively prevented the special master from undertaking a searching

**B.** *Waiver of Objection Based on Appearances*

In this case, there is no disagreement among the parties that Petrowitz had no way of knowing, when he filed the administrative appeal before the SBA, that he would be opposed by the same law firm that had appeared on behalf of a party in the case over which he was presiding as special master; this point was clearly conceded at oral argument.  We may conclude without hesitation, therefore, that the special master's act of filing the administrative appeal was entirely proper.  Any appearance of impropriety occasioned by the master's participation in the SBA appeal arose only because Cole and Groner, through Fleischer, subsequently appeared as opposing counsel.

Both Fleischer and Battocchi filed affidavits indicating that they were unaware that Professor Petrowitz had donned both the role of decisionmaker and the role of opposing counsel when Cole and Groner entered the SBA proceedings; they became aware of the potential conflict only after the fact, and only because of a happenstance conversation between them.  We have not the slightest reason to doubt their account of how the matter came to their attention.  The lack of actual knowledge as between members of a law firm, however, is not dispositive of the issue before us.  District of Columbia law provides:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

D.C.CODE ANN. § 41–111 (1981).

■ Obviously, as counsel for Sterlacci, Battocchi individually knew that Petrowitz

inquiry into his ability impartially to resolve the damages issues in this case.  We do note, however, that the special master responded thoroughly to appellant's allegations of actual bias.

was serving as special master in his dispute with Nystrom and Jenkins; and since his representation in that case was undertaken in his capacity as a member of the firm of Cole and Groner, it was a "matter relating to partnership affairs." We believe, moreover, that Battocchi "reasonably could and should have communicated" to his colleagues at Cole and Groner that he was participating in a proceeding in which Petrowitz acted as a special master. In order to avoid problems arising from the representation of clients with adverse interests, it is standard practice for law firms to assure that each partner is aware of the clients and matters with which the firm is involved. It will not unreasonably burden this conflict-avoidance procedure if partners are expected also to notify each other of the special masters before whom they are appearing.

■ D.C. law thus charges Fleischer with constructive notice of Petrowitz's role as special master in the *Sterlacci* case when he entered an appearance on behalf of Accusonics in the SBA proceeding in which Petrowitz was already counsel of record for Radalab. Charged with knowledge of Petrowitz's potentially conflicting roles, Cole and Groner had to choose between alternative courses of action: either (1) decline to represent Accusonics in the SBA appeal proceeding, or (2) proceed with that representation, after full disclosure to, and agreement by, both Accusonics and Sterlacci, thereby waiving any objection to the special master's continued participation in *Sterlacci* based on the appearance of a conflict of interest. The firm could not reasonably suggest that, instead, Petrowitz withdraw from either proceeding because of an appearance of impropriety that it created by its own actions, which were no doubt taken only because of a failure to communicate relevant information within the firm.

■ The choice between these alternatives was never consciously made, of course, because neither Fleischer nor Battochi was actually aware of the critical details of the matter in which the other was involved on behalf of the partnership. Indeed, even if their firm had an optimally effective conflict-avoidance procedure, there would always be some risk that a partner would lack actual knowledge of such a conflict. Accordingly, it would have been desirable for the special master to have pointed the potential problem out to the respective attorneys when it came to his attention. Indeed, as a special master, Petrowitz was ethically required to make such a disclosure if, as we may fairly assume, his impartiality might otherwise have reasonably been questioned. *See* CODE OF JUDICIAL CONDUCT, *supra*, Canon 3.D (one disqualified by reason of appearance only may, instead of withdrawing, disclose on record basis of disqualification, which parties and lawyers may waive); 28 U.S.C. § 455(e) (same); AMERICAN ARBITRATION ASS'N, CODE OF ETHICS FOR ARBITRATORS IN COMMERCIAL DISPUTES Canon 11.A–C (1977) (requiring arbitrators to disclose, "at any stage of the arbitration," any relationships that "might reasonably create an appearance of partiality or bias").[3] If disclosure had been made, Cole and Groner, and its clients, could have made an informed decision about which of the alternatives open to them would best serve their respective interests.[4] Regrettably, however, the special master assumed away this responsibility, choosing to rely instead on the law firm's obligation to make all of its members aware of each of its members' partnership affairs.

■ This case, therefore, involves complementary failures on the parts of both Cole and Groner and of special master

---

**3.** We need not consider the consequences, apart from its effect, if any, on the motion to disqualify, attending the special master's failure to disclose the potential conflict created by Cole and Groner's appearance before the SBA. The ethical obligations found in the Code of Ethics for Arbitrators in Commercial Disputes are not enforced through judicial review, as noted therein.

**4.** While we express no view on the firm's responsibilities to its clients, we recognize that the clients' interests are among those most immediately to be protected by effective communication among members of a law firm and timely disclosure of possible conflicts of interests.

Petrowitz effectively to disclose among themselves the problems created by Fleischer's participation in the SBA proceeding. While the special master's failing in this regard is not excusable, neither is it decisive in view of the statutory imputation of knowledge to Cole and Groner. Their objection to the special master's participation in the *Sterlacci* case is thus waived to the extent that it rests upon the appearance of impropriety, as opposed to actual bias.[5]

Our conclusion that the objection is waived would stand, even apart from the constructive notice provision of the District of Columbia partnership law, on the extreme untimeliness of the appellant's motion to disqualify. That motion came only after proceedings before the special master had been completed and the special master's report had been filed. As we recently held, "[a] motion for recusal based upon the appearance of impropriety can have only prospective effect." *Liberty Lobby,* 838 F.2d at 1302 (citing *Murphy,* 768 F.2d at 1539). A motion to disqualify a special master should be subject to the same limitation.[6]

### III. Actual Bias

Sterlacci argues, in the alternative, that the special master should be disqualified, and his report vacated, because the report and the SBA proceedings demonstrate that Petrowitz was actually biased against Cole and Groner, and hence against their client. This portion of appellant's motion is unaffected by the waiver occasioned by Fleischer's participation in the SBA proceeding. *See* Code of Judicial Conduct, *supra,* at Canon 3.C.(1)(a) (disqualification for "personal bias or prejudice concerning a party"); *id.* at Canon 3.D (same not waivable); *cf. Murphy,* 768 F.2d at 1540 (§ 455 read to same effect). Thus, even though a party may have waived any "appearance" problems arising in proceedings before a special master, the district court may, upon motion, properly review a claim of actual bias.

A party alleging actual bias on the part of a judge must prove that claim by evidence of the judge's extra-judicial conduct or statements that are plainly inconsistent with his responsibilities as an impartial decisionmaker. *Liberty Lobby,* 838 F.2d at 1301; *United States v. Haldeman,* 559 F.2d 31, 132–34 & n. 297 (D.C. Cir.1976) (en banc). Because, as we concluded above, special master Petrowitz performed a role functionally indistinguishable from that of a judge, the same standard applies to Sterlacci's claim that Petrowitz was actually biased against him.

The only evidence of actual bias drawn from extra-judicial sources that Sterlacci has presented to us is in the papers Petrowitz filed with the SBA on behalf of Radalab, Inc.[7] These papers, Sterlacci contends, "contained unprovoked acri-

---

**5.** In *United States v. Murphy,* the Seventh Circuit intimated that where the facts surrounding a judge's possible conflicts are or should be known by the parties in a case before that judge, disqualification based on the appearance of partiality may be waived, even though the judge makes no attempt to disclose the potential conflict. *Murphy,* 768 F.2d at 1540–41. We believe the same rule should be applied to a knowledgeable party before a non-disclosing special master, although we reiterate that disclosure should have been made.

**6.** Counsel for appellant forthrightly drew the attention of the court to this recent precedent, which was decided after the close of briefing, but counsel made no attempt to distinguish the case.

**7.** Not surprisingly, the special master's report, on its face, contains no evidence of actual bias stemming from extra-judicial sources. Sterlacci argues nonetheless that the report provides probative evidence of actual bias because it "resolves virtually every disputed issue against [him], and arrives at an ultimate award to him which is unreasonably low." Sterlacci apparently argues, in other words, that the findings in the report can be related to an extra-judicial source of prejudice, namely, Petrowitz's advocacy before the SBA. Thus, Sterlacci would have us engage in a more painstaking review than the "clear error" standard of Rule 53 mandates.

Even if such review were appropriate, and we are convinced that it is not, Sterlacci's claim must fail. As a means of establishing actual bias, a court's efforts to relate a master's findings to extra-judicial actions that are sufficient to raise a substantial question about disqualification on the basis of appearances, but are insufficient in themselves to establish actual bias, would ultimately require a judgment too refined and much too calibrated in its distinc-

mony and unwarranted personal attacks upon Fleischer," and thus demonstrate Petrowitz's actual bias or prejudice against Cole and Groner. While the *ad hominem* aspect of Petrowitz's filings is a bit unusual, *see, e.g., supra* at p. 4, we cannot say that cantankerous remarks of this type are clearly beyond the bounds of proper advocacy. There is, moreover, simply no evidence that Petrowitz's loss, in his professional capacity as an advocate before the SBA, affected him personally, so as to raise a concern that he would try to "even the score" with Cole and Groner in his capacity as the special master in *Sterlacci.* On average, each attorney suffers a comparable loss in fully one half the contests he enters; in only the rare instance, however, is a lawyer thereafter incapable of respecting his adversaries and maintaining amicable professional relations with them. There is no evidence of that failing chargeable to special master Petrowitz.

On the evidence presented to us, we can conclude nothing more than that Petrowitz's involvement in the SBA proceeding as an advocate raised a substantial question as to whether he should have been disqualified on the basis that these activities raised the *appearance* of a conflict of interest. That objection, as we have shown above, Sterlacci waived.

### IV. CONCLUSION

The district court in this case found "no indication of bias and no reason to disqualify the master." Having determined that Sterlacci waived any disqualifying appearance of impropriety, we have reviewed with care the specific examples that Sterlacci has cited as evidence of actual bias. We have found that this evidence is not probative of actual bias on the part of the special master. Accordingly, the judgment of the district court is

*Affirmed.*

tions to be practical. Such an undertaking would inevitably become an exercise in judicial speculation. Speculative conclusions of bias are, however, ultimately nothing more than conclusions deduced from "appearances." Sterlacci has waived objections based on appearances, and they cannot be resurrected under the guise of "actual" bias.