Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 15, 2004          Decided September 14, 2004

———

No. 03-5047

IN RE: PHILLIP A. BROOKS
PETITIONER

———

Consolidated with
Nos. 03-5048, 03-5049, 03-5050, 03-5057

———

On Petitions for Writ of Mandamus
(No. 96cv01285)

———

*Robert D. Luskin* argued the cause for petitioners. On the petitions for writ of mandamus and reply were *Amy Berman Jackson, John Thorpe Richards, Jr., Elizabeth Wallace Fleming, Michael D. Goodstein, Deanna Chang, William H. Briggs, Jr., Marc E. Rindner, Hamilton P. Fox, III, Gregory S. Smith, Thomas E. Wilson, Bradley S. Lui, Dwight Bostwick,* and *Melissa McNiven.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*G. William Austin, III* argued the cause for respondents. With him on the response were *Dennis M. Gingold, Elliott H. Levitas* and *Keith Harper*.

Before: GINSBURG, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Before us are five petitions for writs of mandamus filed by 11 current and former officials and employees of the Departments of the Interior (DOI) and of Justice. Each of the petitioners was the subject of an investigation, initiated by the district court, to determine whether that individual should be ordered to show cause why he or she should not be held in contempt for conduct relating to the litigation over the DOI's handling of monies held in trust for individual Indians.

The petitioners originally sought the recusal of District Court Judge Royce Lamberth, Special Master Alan Balaran, and Special Master-Monitor Joseph Kieffer III based upon alleged *ex parte* communications they made or received in the course of that litigation. Special Master Balaran has since resigned and we ordered Special Master-Monitor Kieffer removed in *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003). The petitioners still seek to recuse Judge Lamberth and to suppress the reports and recommendations written (but not filed with the district court) by Special Master Balaran before he resigned.

We now deny the petition to recuse Judge Lamberth from the pending contempt proceedings because he has stated he did not receive *ex parte* communications substantively related to those proceedings from either Balaran or Kieffer, and we have no reason to conclude he abused his discretion by refusing to recuse himself. We do, however, vacate Balaran's proposed reports and recommendations relating to the contempt proceedings.

## I. Background

The present petitions and the contempt proceedings to which they relate arise from the ongoing litigation over the

DOI's mishandling of the "Individual Indian Money" trust accounts created for each Indian having an interest in certain allotted lands. *See Cobell*, 334 F.3d at 1133. Because the petitioners are not parties to that case, the facts and the procedural history relevant here may be recounted without laying waste the better part of a forest.

In February 1999 the district court held then-Secretary of the Treasury Robert Rubin, then-Secretary of the Interior Bruce Babbitt, and then-Assistant Secretary of the Interior Kevin Gover, in their official capacities, in civil contempt for violating two discovery orders issued in the trust reform litigation. *See Cobell v. Babbitt*, 37 F. Supp. 2d 6 (D.D.C. 1999). The district court, with the consent of the parties, then appointed Alan Balaran to serve as a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure in order to "oversee the discovery process in this case." In August 1999 the district court additionally authorized Balaran to make "on-site visits to any location where [trust account] Records are maintained" in order to protect such records "from destruction or threatened destruction."

In April 2001 the district court, again with the consent of the parties, appointed Joseph Kieffer to serve for one year as a "court monitor," with a mandate to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings with the Court." Kieffer was "permitted to make and receive *ex parte* communications with all entities necessary and proper to effectuate his duties." By October Kieffer had issued four reports. The reports were "unflattering to the DOI" and "prompted the district court to order Secretary Norton and Assistant Secretary McCaleb . . . to 'show cause why they should not be held in civil contempt of court in their official capacities,' " *Cobell*, 334 F.3d at 1135; *see also Cobell v. Norton*, 226 F. Supp. 2d 1, 19 (D.D.C. 2002) (*Contempt Referrals*).

The order to show cause set out five possible reasons (or "specifications") for holding Norton and McCaleb in contempt: four were based upon Court Monitor Kieffer's reports and addressed the DOI's noncompliance with court orders

relating to trust reform; the fifth was based upon a report issued in November 2001 by Special Master Balaran concerning the destruction of email records by officials and employees of the DOI. *See Cobell*, 334 F.3d at 1135; *see also Cobell v. Norton*, 237 F. Supp. 2d 71, 76 (D.D.C. 2003) (*Order Denying Recusal*). On September 17, 2002 the district court held both Norton and McCaleb in civil contempt of court upon all five specifications. *Contempt Referrals*, at 161, *rev'd*, 334 F.3d at 1145-50 (vacating contempt charge against Norton because specifications either did not support such a charge or were based upon "conduct of her predecessor," and vacating contempt charge against McCaleb because court did not identify any "specific act or omission whatsoever on his part"). At the same time the district court referred to Balaran (1) the plaintiffs' October 2001 "Motion for Order to Show Cause Why Interior Defendants and Their Employees and Counsel Should Not Be Held in Contempt for Violating Court Orders and for Defrauding This Court . . . ," and (2) their March 2002 "Motion for Order to Show Cause Why Interior Alleged Contemnors and Their Counsel Should Not Be Held in Contempt for Destroying E-mail." *See Order Denying Recusal*, at 76; *see also Contempt Referrals*, at 155.

With respect to the first motion, the court instructed Balaran to

> develop a complete record with respect to these 37 non-party individuals [and], upon completing his review of these matters, issue a report and recommendation regarding whether each individual should be ordered to show cause why he or she should not be held in (civil or criminal) contempt of court, or whether other sanctions are appropriate against such individuals.

*Contempt Referrals*, at 155. With respect to the second motion, the court instructed him to "issue a report and recommendation regarding the issues raised." *Id.* at 155-56.

Thereafter, 16 of the 37 non-parties named in the September 17 referrals filed motions in the district court to recuse Judge Lamberth, Special Master Balaran, and Special Master-Monitor Kieffer from participating in the contempt pro-

ceedings.*   They argued that "although the communications between the Court and its special masters were not improper in the context of the underlying litigation," they were inconsistent with participation in the contempt proceedings because "the Master and the Monitor furnished the Court with extrajudicial knowledge about the current litigation." *Order Denying Recusal*, at 77-78.   In the alternative, the movants sought discovery regarding the substance of the *ex parte* communications Balaran and Kieffer had with employees and officials of the DOI and with the district judge.   The district court denied the motions in their entirety.

In February 2003, 11 of the 16 movants petitioned this court for writs of mandamus providing the same relief.**   Their petitions were held in abeyance while the court decided *Cobell*, 334 F.3d 1128, in which we concluded, among other things, that Kieffer's appointment as Special Master-Monitor was not valid because it was made over the objection of the defendants.

Following our decision in *Cobell*, we ordered further briefing and argument on the current petitions.   The plaintiffs in the underlying trust reform litigation then responded to the five petitions, and the petitioners filed a consolidated reply.   After oral argument on March 15, 2004 we ordered Special Master Balaran to take no further actions with respect to the

---

* The district court had renewed Kieffer's appointment in April 2002, this time as a Special Master-Monitor, over the objections of the petitioners.

** In No. 03-5047 petitioner Phillip Brooks seeks to recuse Judge Lamberth or to take discovery of his *ex parte* contacts with Kieffer and Balaran;   in No. 03-5048 petitioners Bruce Babbitt, Edith Blackwell, Edward Cohen, John Leshy, and Michael Rosetti seek to recuse Judge Lamberth and Special Master Balaran;   in No. 03-5049 petitioners Tom Clark II, Charles Findlay, and John Most also seek to recuse Judge Lamberth and Special Master Balaran;   in No. 03-5050 petitioner Anne Shields seeks to recuse Judge Lamberth or to take discovery of his *ex parte* contacts with his judicial officers;   and in No. 03-5057 petitioner Sabrina McCarthy seeks to recuse Judge Lamberth or to take discovery of his *ex parte* contacts with his judicial officers and to recuse Special Master Balaran.

reports and recommendations he was going to issue pursuant to the September 17 referrals. On April 5 Balaran resigned as a special master both in the contempt proceedings and in the underlying trust reform litigation. With the removal of Kieffer and the resignation of Balaran from all aspects of the *Cobell* litigation, all that remained of the present petitions were the issues relating to the disqualification of the district court judge — or so it seemed.

On April 15, 2004 the plaintiffs filed a "Suggestion of Mootness" in part, arguing there is "no remaining controversy" with respect to Balaran. The petitioners, however, responded that the question of Balaran's recusal is not moot because Balaran had completed and, but for our order of March 15, would submit to the district court his reports and recommendations relating to the contempt charges against the 37 individuals who are not parties to the underlying litigation. Therefore, the petitioners claimed "any reports [Balaran] completed after the time he should have been recused would be tainted and invalid and should not be released or shared with the District Court."

## II. Analysis

In the light of our earlier disqualification of Special Master-Monitor Kieffer, and of Special Master Balaran's resignation, two questions remain. First, must the district judge, as the petitioners claim, either (a) recuse himself or (b) allow discovery of the *ex parte* communications he had with Kieffer and Balaran? Second, may Balaran submit to the court the reports and recommendations he prepared pursuant to the September 17 referrals?

### A. Recusal of the District Judge

A writ of mandamus is "an extraordinary remedy, to be reserved for extraordinary situations." *Cobell*, 334 F.3d at 1137. Nonetheless, "we will issue a writ of mandamus compelling recusal of a judicial officer where the party seeking the writ demonstrates a clear and indisputable right to re-

lief." *Id.* at 1139. A party has such a right when a judicial officer has "personal knowledge of disputed evidentiary facts," 28 U.S.C. § 455(b)(1), or when the judicial officer's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a).

The petitioners argue Judge Lamberth should have disqualified himself pursuant to 28 U.S.C. § 455(b)(1) because he acquired personal knowledge of disputed facts through his *ex parte* communications with Kieffer and Balaran. According to the petitioners, Kieffer's time sheets show that he met with the District Judge *ex parte* more than 80 times, for a total of more than 120 hours. Similarly, in the motions for recusal they filed in the district court, the petitioners claimed that Balaran's time records "reveal[ed] seven private meetings with the Court for a total of approximately eight hours." *See Order Denying Recusal*, at 89. The petitioners also point to *ex parte* communications Balaran had with numerous individuals involved in the *Cobell* litigation, including DOI officials and employees, plaintiffs' counsel, and the Independent Counsel investigating Secretary Norton, which communications they claim Balaran later "transmitted" to the district court in the form of "memoranda . . . regarding matters such as compliance with discovery obligations [and] sanctions."

The respondents reply that the district court fully addressed each of the petitioners' claims in its ruling denying their motions for recusal. There the district judge acknowledged having met privately with the Court Monitor and the Special Master but rejected any suggestion those meetings constitute a proper ground for his recusal. Far from it, the district court stated:

> It is not only appropriate but necessary for the Court, as principal, to consult with its agents regarding the manner in which they are carrying out their assigned duties . . . . [T]hroughout these regular consultations, the Court discussed with the Master the general nature of the ongoing tasks that the Master was involved with,

in order to ensure that the Master was responsibly carrying out the duties to which he was assigned.

*Id.* at 89-90.

The district judge cast additional light upon the nature of his off-the-record meetings in describing his consultations with Kieffer:

> In the course of a typical meeting, for example, the Monitor might inform the Court that he planned to travel to New Mexico to meet with the Office of the Special Trustee, and receive a briefing about their role in the historical accounting process. Or he might explain that he traveled to Billings, Montana to meet with title records office personnel, examine their hard copy records, and review the pilot [Trust Asset and Accounting Management System]. Or he might inform the Court that he had been briefed by the Deputy Commissioner of the Bureau of Indian Affairs about the organization of their office.

*Id.* at 91-92. The judge concluded that the "subject of these consultations was what the Monitor was doing, not what he was finding"; they did not expose the court to any "bare facts" relevant to the underlying investigation. *Id*. at 92.

The petitioners resist that conclusion upon the basis of statements in two opinions the judge rendered in the course of the *Cobell* proceedings. The first is this snippet from the district court's opinion of September 17, 2002: "[T]he Court is personally aware of the background of the April 19, 2002 meeting, the conversations at that meeting and at the subsequent meetings between the Deputy Secretary and the Court Monitor." *Cobell v. Norton*, 226 F. Supp. 2d 163, 170 (D.D.C. 2002).* They also point to the district court's opinion of September 30, 2002 concerning Court Monitor Kieffer's request for compensation, in which the court stated: "It is

---

* Although the petitioners say the opinion is "replete with references to information gathered by the Court Monitor and shared with the District Court," they identify no other and none is apparent to us.

sufficient that the Court Monitor has advised this Court regarding his meetings and discussions with third parties and has always informed this Court about the nature, extent, and substance of such meetings and discussions upon request." *Cobell v. Norton*, 223 F. Supp. 2d 156, 160 (D.D.C. 2002).

As the respondents point out, the district judge addressed both the quoted statements in his opinion denying the petitioners' motion to recuse, in which he concluded, "Any honest reading of these opinions ... demonstrates that movants have fundamentally misconstrued" the relevant passages. *Order Denying Recusal*, at 93. With respect specifically to the September 17 opinion, the judge explained that the Deputy Secretary of the DOI had requested that the Court Monitor attend the April 19 meeting in order to resolve a dispute between the Deputy Secretary and the Special Trustee appointed by the court in the underlying trust reform litigation:

> [T]he only reason that the Court knew anything about the April 19 meeting, or the background relating to that meeting, is that the Monitor was compelled to "present[ ] the facts surrounding the request of the Deputy Secretary" to hold the meeting, in order that the Court could make an informed decision about whether to authorize the Monitor's attendance at the meeting.

*Id.* at 96. So understood, the September 17 opinion does not show that the district judge acquired personal knowledge of disputed evidentiary facts.

Similarly, the district court explained why the single sentence to which the petitioners pointed in the court's September 30 opinion, when viewed in its context, is innocuous. The court was not asking the Court Monitor for substantive information; rather it was asking for information relevant to verifying "the reasonableness and propriety of the Monitor's compensation requests." *Id.* at 97. Thus, the district court reasonably explained that in referring to the "nature, extent, and substance of [Kieffer's] meetings" with third parties, the court was concerned with the subject matter, not the actual content, of those meetings.

The petitioners nonetheless claim the district judge's *ex parte* contacts with Kieffer and Balaran provided him with "information [that] cannot be 'controverted or tested by the tools of the adversary process,' " quoting *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996). Just like the petitioners in *Edgar*, they claim, the "Petitioners here are completely in the dark about what transpired during the Monitor's 120 hours of communications with the Court." The respondents correctly point out, however, that unlike the district judge in *Edgar*, who "declined to state on the record his own memories of what happened" in his private meetings with a panel of court-appointed experts, *id.* at 258, the district judge here declared "unequivocally" he knows of no substantive information that was provided during any of his consultations with Kieffer or Balaran. *Order Denying Recusal*, at 92; *see also id.* at 90.

Still unappeased, the petitioners question whether the district judge should be relied upon to recall what was discussed in so many unrecorded meetings lasting so many hours. But their question reflects a misconception about the assurance required of the judge: He need not recall all that was discussed at those meetings; he need only recall that the substance of the special masters' findings was not discussed. If, as he represents, that was an implicit ground rule for the conduct of those meetings, then the pertinent question is whether it was ever violated. We see no reason for not accepting the judge's unequivocal response.

Moreover, it is not surprising that the district judge met many times with the Special Master and the Court Monitor; he had to oversee and to coordinate their efforts on the court's behalf during four years of complicated and contentious litigation. Keeping a careful inventory of the tasks they had performed appears sensible, particularly in the light of the defendants' several challenges to Kieffer's and Balaran's requests for compensation. *See, e.g., Cobell*, 223 F. Supp. 2d at 159 (defendants request adjustment or reconsideration of Kieffer's compensation because he "failed to provide sufficiently detailed information about the work performed").

Because neither the proffered evidence of *ex parte* meetings between the court and its agents nor the district court's September 2002 opinions show the judge had acquired "personal knowledge of disputed evidentiary facts," 28 U.S.C. § 455(b)(1), we hold the petitioners have failed to show the "clear and indisputable right" to relief that is required for this court to issue a writ of mandamus.

The petitioners also claim the district judge should be recused because his "impartiality [in any contempt proceedings] might reasonably be questioned," 28 U.S.C. § 455(a), based upon the *ex parte* communications considered above. "The standard for disqualification under § 455(a) is an objective one. The question is whether a reasonable and informed observer would question the judge's impartiality." *United States v. Microsoft*, 253 F.3d 34, 114 (D.C. Cir. 2001). In this case the answer is no, for the same reason we determined above that the judge's *ex parte* contacts with the special masters did not give him personal knowledge of disputed evidentiary facts.

B. Discovery

As an alternative to recusal of the district judge, several of the petitioners claim a right to take discovery of the *ex parte* communications between the judge and his agents. The respondents point out that the petitioners "fail to identify a single case authorizing the discovery they demand under such circumstances." That is not surprising considering the rather extraordinary relief the petitioners request — discovery of the private communications between a district judge and subordinate judicial officers regarding matters the judge has expressly stated are procedural and non-substantive. The petitioners argue that, as in *Edgar*, "The appearance of impartiality concerns are magnified in this case . . . by the District Court's refusal to permit discovery regarding the nature of *ex parte* contacts." In other words, discovery is warranted because the district court's refusal to allow it creates an appearance of partiality that can be dispelled only by allowing discovery. The circularity of this argument is manifest. In any event, as we have seen, *Edgar* is not on

point because the judge in that case "declined to state on the record his own memories of what happened" during his *ex parte* communications with a panel of experts, 93 F.3d at 258, whereas here the district judge has described "the nature of the *ex parte* contacts," and stated unequivocally that those contacts were of a procedural and not a substantive nature. Accordingly, the petitioners have not shown a "clear and indisputable right" to the extraordinary relief they request.

C.   The Special Master

Several of the petitioners urge that despite Balaran's resignation "this court must rule on whether the Special Master should have been recused from the contempt proceedings under § 455, and if so, permanently enjoin the release of his report and recommendations and any other work product he may have completed." In reply the respondents argue that vacatur of Balaran's reports and recommendations was not the relief requested in the petitions and is "without justification [and] has no basis in the law." If, however, the September 17 referrals to Balaran as special master in the *Cobell* litigation were made in error because Balaran should have been recused from the contempt proceedings, then any work produced pursuant to the September 17 referrals must also be "recused" — that is, suppressed. We are constrained, therefore, to determine whether Balaran should have been recused from the contempt proceedings.

The petitioners claim Balaran should have been recused from the contempt proceedings under § 455(b)(1) because, as a special master, he had been performing investigative and adjudicative tasks that entailed *ex parte* communications with witnesses and third parties in the underlying trust reform litigation, as documented in Balaran's time sheets. For example, Balaran had *ex parte* contacts with Dennis Gingold, the plaintiffs' lead counsel, *see, e.g.,* Invoice of 10/7/99, as well as several other of the plaintiffs' attorneys, *see, e.g.,* Invoice of 3/22/00. Balaran also had *ex parte* contacts with unnamed "moles," *see, e.g.,* Invoice of 4/18/01 ("Review submissions from 'Mole 43'"); Invoice of 4/20/01 ("Review correspondence from 'moles' in field"), and unnamed employees at the DOI,

*see, e.g.,* Invoice of 2/5/01. Accordingly, the petitioners rely upon *Cobell*, 334 F.3d 1128, in which we held squarely that "in this Circuit the ethical restrictions of § 455 apply to a special master," *id.* at 1144 (citing *Jenkins v. Sterlacci*, 849 F.2d 627, 630-32 & n.1 (D.C. Cir. 1988)).

The district court, in denying the petitioners' motions to recuse Balaran, reasoned that the holding in *Cobell* quoted in the previous sentence, because it invoked the precedent of *Jenkins*, did not apply to Balaran as special master in the contempt proceedings:

> [T]he *Jenkins* court took pains to clarify that "*at least insofar as special masters perform duties functionally equivalent to those performed by a judge*, they must be held to the same standards as judges for purposes of disqualification." *Jenkins*, 849 F.2d at 631 n.1 . . . . And the litmus test by which special masters are construed to be the "functional equivalent" of judges is the "clearly erroneous" standard of deference.

*Order Denying Recusal*, at 84-85 (emphasis in original). Because the district court proposed to review Balaran's findings in the contempt proceedings *de novo* rather than for clear error, *but see* FED. R. CIV. P. 53(e)(2) (2002) ("the court shall accept the master's findings of fact unless clearly erroneous"), it concluded the Special Master's duties would be non-adjudicative in nature, and the Special Master therefore would not be subject to recusal under § 455.

As an initial matter, we note Balaran's own description of his role, in a memorandum sent to "All Counsel" at the outset of the contempt proceedings, which plainly demonstrates the adjudicative nature of his position. For instance, he undertook "preliminarily [to] decide whether the individual Bills of Particular warrant dismissal before initiating any discovery." In any event, we were not in *Jenkins* concerned only with situations in which a special master is the "functional equivalent" of a trial judge because his findings are accorded deferential "clear error" review. Rather, we were concerned with any situation in which "a special master's partiality may

operate unchecked and uncheckable by the district court." *Jenkins*, 849 F.2d at 631.

The district court's proposal in this case to review the Special Master's findings *de novo* does not solve the problem of "unchecked and uncheckable" partiality. Balaran's four-year involvement in the trust reform litigation entailed innumerable contacts with witnesses and third parties likely to have information relevant to the contempt proceedings. Inevitably, he would have formed impressions about the character of some, perhaps many, of the individuals named in the contempt proceedings. Consider the letter of January 31, 2001 Special Master Balaran wrote to Phillip Brooks, Esq., one of several attorneys in the Department of Justice who represented the DOI and later became a subject of Balaran's contempt inquiry:

> I am firmly resolved to expose and reform [Office of Trust Records senior] management infirmities once and for all. What presents a more complicated dilemma is the recent conduct of government counsel. It has come to my attention that certain attorneys currently employed by the Department of Justice and the Office of the Solicitor (in concert with OTR management) have launched a misguided campaign to undermine my authority. These individuals have reportedly gone to great lengths to malign me both personally and professionally in front of [Bureau of Indian Affairs] employees and to misinform these employees as to the true purpose behind my appointment and as to the inherent rights and responsibilities attendant to that position. They have successfully dissuaded BIA/OTR employees from contacting me freely. While I understand that you may choose to discount the credibility of those who chose to report these events to me, rest assured I have spoken to these individuals at length and I am convinced, given the level of detail contained in their reports and my own independent verification, that what I am being told is true. The question therefore remains how to address government counsel who publicly call into question my ability to

read, who liken my investigation to those undertaken by television characters or who insist that I have never practiced law. As I have been called worse things by better lawyers, I will not take these personal insults to heart. I will, however, not tolerate what I consider to be a transparent attempt to undermine the Court's orders and I will not accept the conduct of any official who creates an environment where employees fear reprisal simply for contacting my office.

In view of the tone and the substance of this letter, it seems likely, if not inevitable, that Balaran's compilation of the record for the district court's review, not to mention his reports and his recommendations, would be subject to selection bias; at the very least, an observer apprised of all the facts would reasonably question his impartiality. Indeed, if Balaran could properly serve as special master advising the district court whether to initiate contempt proceedings, then it would seem equally permissible for a judge presiding over a criminal proceeding to dispatch his law clerk to visit the scene of the crime, take fingerprints, interview witnesses, and report back to the judge about his findings. The judge's undertaking to review the clerk's findings *de novo* would not be assurance against the biases of the clerk affecting the judgment of the court; so much the worse if the clerk, like Special Master Balaran, had personal knowledge of the parties — and perhaps of the events in suit — from prior dealings with them.

The respondents, echoing the district judge's rationale, in part, for denying the motions to recuse Special Master Balaran, *see Order Denying Recusal*, at 85-88, assure this court that any *ex parte* communications Balaran had with third parties in connection with his duties in the underlying *Cobell* litigation will not taint the contempt proceedings because "his reports to the Court concerning [Information Technology] security and e-mail destruction were not based on any information derived from" those communications. They also note Balaran assured the district court and the parties that his "[f]indings stemming from proceedings in which the Named

Individuals have not been afforded the opportunity to participate and/or comment will not be considered during these proceedings." These assurances do not, however, cure the problem of selection bias. Our concern is not with information that "enters the record and may be controverted or tested by the tools of the adversary process," *Edgar*, 93 F.3d at 259; our concern is with information that "leave[s] no trace in the record," *id.* — such as Balaran's *ex parte* contacts with "moles" and unnamed DOI employees — that may reasonably be expected to color the way in which he approaches his task, and ultimately his reports and recommendations to the district court, and thus to taint the contempt proceedings despite the steps taken to insulate those proceedings from the information to which Balaran was exposed *ex parte*.

Because the district court's proposed *de novo* review of Balaran's findings does not render his task as special master in the contempt proceedings non-adjudicative, the *ex parte* communications Balaran had in his role as special master in the trust reform litigation required his recusal from the contempt proceeding pursuant to § 455(b)(1). Moreover, the nature and extent of his *ex parte* contacts would lead an informed observer reasonably to question his impartiality, thereby requiring his recusal independently pursuant to § 455(a). We therefore hold the district court erred in failing to grant the petitioners' motions to recuse Balaran.

## III. Conclusion

The petitions for a writ of mandamus to recuse Judge Lamberth are denied. Because Special Master Balaran had *ex parte* contacts that may have given him personal knowledge of disputed evidentiary facts relevant to the contempt proceedings, those proceedings should never have been referred to him. Therefore any reports, recommendations, or other work product Balaran prepared pursuant to the September 17 referrals may not be submitted to the district court or otherwise disseminated in any manner.

*So ordered.*