UNITED STATES of America,
Appellant,

v.

CERTAIN PARCELS OF LAND LOCATED IN FAIRFAX AND LOUDOUN COUNTIES, COMMONWEALTH OF VIRGINIA, and Grace Beard et al., Appellees.

No. 11205.

United States Court of Appeals
Fourth Circuit.

Argued June 1, 1967.

Decided Oct. 20, 1967.

A. Donald Mileur, Attorney, Department of Justice (Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, B. Richard Taylor and Harris Grimsley, Attorneys, Department of Justice, on brief), for appellant.

Hershel Shanks, Washington, D. C. (Henry H. Glassie, and Glassie & Molloy, Washington, D. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

To acquire an access road to Dulles International Airport, the United States condemned and, by its declaration of taking filed May 25, 1960, took a strip of land 300 feet wide and 3½ miles long (consisting of 175.3360 acres) through the middle of an approximately 7,000 acre tract (the Sunset Hills tract) owned by A. Smith Bowman Distillery, Inc. ("Bowman").[1] The Sunset Hills tract was approximately 3¾ miles wide, in an east-west direction, and approximately 5.68 miles long, in a north-south direction. The strip of land acquired for the access road lay in an east-west direction.

A commission, appointed pursuant to Rule 71A(h), Fed.R.Civ.P., valued the 175.3360 acre strip at $263,004.00, and severance damages to the southern portion of the Sunset Hills tract at $280,014.32. Its report was adopted by the district judge. The parties accept the judgment with regard to the value of the actual taking, but the United States appeals from the portion of the judgment awarding severance damages. We affirm the judgment in its entirety.

Prior to the taking, the Sunset Hills tract, which is approximately 18 miles from Washington, D. C. and approximately 5–6 miles from Dulles International Airport, was transected in an east-west direction by a railroad, the traffic on which was described as "light" or "dwindling."[2] The portion of the overall tract north of the railroad, before the taking, consisted of 3032.3694 acres, and that south, 3956.0416 acres. The northern portion had a frontage of approximately 1700 feet on a primary, hard-surfaced road. The southern portion had frontage on a secondary, hard-surfaced road.

The strip taken was in most part south of and parallel to the railroad right-of-way. The road was constructed as a non-access road. Access to the road was thus denied from any portion of the Sunset Hills tract; the road might not be bridged, nor a tunnel constructed thereunder without permission of the United States.

Because of its frontage on the primary road, the commission found no severance damages to the northern portion of the

---

1. The strip was referred to in the proceedings below, and will be referred to in this opinion, as being 300 feet wide, although Bowman correctly points out that there was testimony that it had a minimum width of 400 feet and a maximum width of 650 feet. There is apparently no dispute that the strip contained 175.3360 acres and this was the crucial measure on which damages for its taking were assessed.

2. Under Virginia law, a landowner who owns land on both sides of a railroad has the legal right to cross the railroad at any reasonable place. The railroad may even be required to pay the cost of providing a crossing. Va.Code Ann. §§ 56–363 to 56–369.

Sunset Hills tract by reason of the taking. The correctness of this determination is not questioned on appeal.[3]

Three contentions are advanced on appeal. First, it is argued, that the proof adduced before the commission was insufficient to support the award. Second, the contention is made that the report of the commission, setting forth how it fixed severance damages, lacked the requisite specificity for validity under Rule 71A and applicable judicial standards. Third, the qualifications of one of the commission are attacked because she had previously acted as attorney for one of the owners of a different parcel of land acquired by the United States as part of its overall acquisition of land for the access road. We address ourselves to these contentions, seriatim.

■ By virtue of Rules 71A and 53, Fed.R.Civ.P., the commission's findings of fact are clothed in the armor of the "clearly erroneous" rule. United States v. Merz, 376 U.S. 192, 198–199, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964); United States v. Payne, 368 F.2d 74 (4 Cir. 1966); United States v. Cunningham, 246 F.2d 330 (4 Cir. 1957). Especially is this so where the commission's findings were reviewed and adopted by the district judge, United States v. Lewis, 308 F.2d 453 (9 Cir. 1962), and they will not be disturbed "unless a very plain mistake has been made." Beckley National Bank v. Boone, 115 F.2d 513, 515 (4 Cir. 1940), cert. den. 313 U.S. 558, 61 S.Ct. 835, 85 L.Ed. 1519 (1941); Carpenter v. Union Insurance Society of Canton, Ltd., 284 F.2d 155, 159 (4 Cir. 1960).

■ We need not, therefore, detail all of the conflicting evidence in full. The following brief summary of evidence supporting the correctness of the award is sufficient to demonstrate that the commission's finding as to the extent of severance damages should not be set aside.[4]

Bowman's evidence established that the Sunset Hills tract was unique, in that it was the only property of its size in Northern Virginia, in close proximity both to Washington, D. C. and to the Dulles International Airport under single ownership, and that its highest and best use, as of the date of taking, was the retention or sale of the property for development as a unit pursuant to a plan for development of the tract as a unit. Prior to the taking, water facilities were available to all portions of the tract, sewerage facilities could be provided, and complete internal movement of persons and vehicles within the tract was possible. After the taking, the evidence disclosed, communication across the access road would be extremely difficult. While there would be a single two-lane bridge connecting the two halves of the property after taking, it would be entirely inadequate as a means of circulation between the northern and southern portions of the tract.

Access to Washington from the southern portion of the tract would be limited to the use of circuitous and relatively unsatisfactory roads. Additionally, a large parcel of 159.158 acres which, before the taking was functionally part of the northern portion of the tract, was separated from it; another parcel of 25.5230 acres, which was functionally a part of the southern portion of the tract, was separated from it; a third parcel of 24.584 acres would be rendered, by the taking, no longer contiguous with any other portion of the tract; and two other parcels of 5.966 acres and .9304

---

3. Both northern and southern portions of the tract have improvements. The commission found neither damages nor severance damage to the improvements, and the correctness of this determination is also not raised.

4. We note that in the proceedings below, the United States did not take the position that there were no severance damages to the southern portion of the Sunset Hills tract. It presented the testimony of two witnesses, each of whom conceded some severance damages from the effect of the taking's creating one or more fragmentary tracts in the southern portion, but valued the damages at $10,627.00 and $3,579.00, respectively.

acres, respectively, were so sandwiched between an existing road and the strip which was taken that their use was totally destroyed by the taking. Bowman's valuation experts assessed severance damages to the residue of the southern portion of the Sunset Hills tract at $650.00 per acre, a valuation substantially reduced by the commission in fixing damages in the aggregate amount of $280,014.32.[5]

The United States cites our recent decision in United States v. Mattox, 375 F.2d 461 (4 Cir. 1967) as authority for the disallowance of severance damages here, but we deem our holding there inapplicable to the case at bar. In *Mattox* we were concerned about the right of a landowner to claim severance damages to a parcel of land when a non-contiguous parcel was taken and where, at most, there was a highly improbable, if not impossible, future business purpose to employ both parcels in the operation of a unitary business. Here the parcels were contiguous and there was substantial evidence that their highest and best use was for development as a unit. Absent the taking, no reason why they should not be so employed was shown.

We find no basis on which to say that the commission's findings and its ultimate conclusion as to severance damages were clearly erroneous.

## II

The degree of specificity which a commission report must contain is thoroughly discussed in United States v. Merz, supra.[6] See also, United States v. Payne, supra. When the test as set forth in *Merz*, that the path of the condemnation commission be "distinctly marked," but that there need not be "an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based", are applied to the commission report in the instant case we can only conclude

---

5. Before the commission, the United States moved to strike this testimony on the ground that the witness who testified (the testimony of the other witness was stipulated to be the same) admitted that "comparable" values on which he relied to fix a value of $1,900.00 per acre before taking and $1,250.00 per acre after taking were not "comparable." The United States vigorously presses the same point on appeal. We deem the principal difficulty to arise from the fact that in the area in which the taking occurred there are no other tracts of approximately 7,000 acres under single ownership and no sales of acreage nearly as large in amount. As we read the testimony of the witness, he clearly researched and described 10 sales of substantial acreage but adjusted the prices he thus obtained to reflect the unique characteristics of the Sunset Hills tract. His statement that his "comparables" were not "comparable" was nothing more than a subjective expression of the thought that comparable sales could not be blindly applied to a unique situation. His testimony was thoroughly tested on cross examination; its weight was for the commission.

6. "Conclusory findings are alone not sufficient, for the commission's findings shall be accepted by the court 'unless clearly erroneous'; and conclusory findings as made in these cases are normally not reviewable by that standard, even when the District Court reads the record, for it will have no way of knowing what path the commissioners took through the maze of conflicting evidence. * * * The commissioners need not make detailed findings such as judges do who try a case without a jury. Commissioners, we assume, will normally be laymen, inexperienced in the law. But laymen can be instructed to reveal the reasoning they use in deciding on a particular award, what standard they try to follow, which line of testimony they adopt, what measure of severance damages they use, and so on. We do not say that every contested issue raised on the record before the commission must be resolved on a separate finding of fact. We do not say that there must be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based. The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked. Such a requirement is within the competence of laymen; and laymen, like judges, will give more careful consideration to the problem if they are required to state not only the end result of their inquiry, but the process by which they reached it." (footnotes eliminated) Id., 376 U.S. pp. 198–199, 84 S.Ct. p. 643.

that it was not fatally lacking in specificity.

The report described the appearance of the land, its location, the neighborhood, and the character of its terrain. The quantities of land overall and in the portions north and south of the railroad track, as well as the quantity of land included in the taking, were set forth. The distance of the Sunset Hills tract from metropolitan areas was described, as well as the availability of, and demand for, large tracts for developmental purposes. The roads and highways abutting and traversing the entire tract were described, as was its zoning and the uses to which the land was put on May 25, 1960. The commission, in its report, made a specific finding of the highest and best use of the land. The commission found the fair market value of the land actually taken, the fair market value of the entire tract prior to the taking, and its fair market value immediately thereafter. Disclosure of how a fair market value before and after May 25, 1960 was made by the statement that the commission took into consideration the evidence of comparable sales, with a summary discussion of 14 comparables urged on the commission, and the range of values on a per-acre basis, and other factors. The commission stated that, in determining the fair market value of the tract before and after May 25, 1960, the commission deducted the amount of land encompassed by the actual taking and considered that the strip of land taken was near the center of the tract, that communication across the strip was severely diminished, that the strip taken was parallel to and slightly removed from the railroad right-of-way, and that the easement of a road located within the land was severely curtailed. The commission also discussed the particular damage which the taking would inflict on the 158.6490 acre parcel, as well as the 4 other parcels to which reference has been previously made.

We conclude, therefore, that there were "distinct markers" to the road by which severance damages of $280,014.32

were reached. Substantially, the only fact not disclosed was the components which, when added together, aggregated that amount. But the total arrived at, although its basis was not fully disclosed, was well within the range of testimony as to severance damages adduced before the commission, and we cannot say, when the commission was dealing with such a substantial tract, having so many subsidiary problems with regard to severance damages, that his omission renders the report defective.

### III

To delineate the problem of the qualifications of one of the commissioners, additional facts should be stated. The commissioner in question was an attorney who had represented the owner of a residential homesite approximately 4 miles from the taking in this case. Although the condemnation of that homesite bore the same civil number as the taking in the case at bar, the owner of that tract had no relationship or connection with Bowman. At the time that the commission in the instant case began to function, the condemnation of the homesite, and the commissioner's representation of the owner thereof, had long since terminated.

■ United States v. Lewis, supra, is the leading case on the disqualification of commissioners for bias or conflict of interest, and it establishes the rule that disqualification is a matter for the exercise of discretion by the district judge, unless actual bias has been demonstrated beyond reasonable possibility of disagreement. Id., 308 F.2d 457. As is customary where matters are committed to the sound discretion of the district judge, the exercise of his discretion will not be disturbed unless there is proof of its abuse.

■ There is nothing in this record which shows that the commissioner in question had actual bias against the United States, nor is there any showing that, at the time she served, there was any conflict of interest. On the facts as we have stated them, the district judge,

in his sound discretion, might have removed her, or might have refused to appoint her in the first instance, but there is nothing to indicate an abuse of discretion in failing to remove her or in having appointed her in the first instance.

Affirmed.