199 P.3d 89

In the Matter of the ESTATE OF
Samuel M. DAMON, Deceased
(P. No. 6664)

Trust Created Under The Will of Samuel
M. Damon, Deceased (Equity No.
2816–A).

No. 27132.

Supreme Court of Hawai'i.

Dec. 30, 2008.

Frederick. G. Riecker and John L. McDermott, on the briefs, for Appellant Christopher Damon Haig.

J. Thomas Van Winkle, Katherine G. Leonard and Joanne L. Grimes of Carlsmith Ball LLP, Los Angeles, on the briefs, for Appellees Trustees of the Estate of Samuel M. Damon, Deceased.

MOON, C.J., NAKAYAMA and ACOBA, JJ., Circuit Judge AYABE, in place of LEVINSON, J., Recused, and Circuit Judge NISHIMURA in place of DUFFY, J., Recused.

Opinion of the Court By NAKAYAMA, J.

Respondent–Appellant Christopher Damon Haig ("Haig") appeals from the first circuit court's ("probate court's") January 12, 2005 judgment in favor of Petitioners–Appellees Trustees of the Estate of Samuel M. Damon ("the Trustees").[1] On appeal, as best as we can discern, Haig asserts seven points of error that may be combined into two general points of error, as follows: (1) the probate court abused its discretion by denying his request to disqualify James Kawachika, Esq. as master ("Kawachika" or "Master") of a petition that was filed by the Trustees for approval of the 1999, 2000, 2001, 2002, and 2003 income and principal accounts ("Petition"), and (2) the probate court erred in granting the Petition as recommended by the Master's report. For the reasons that follow, we hold that the probate court abused its discretion when it denied Haig's request to disqualify the Master because a conflict of interest existed between Kawachika and the Trustees. Accordingly, we vacate the probate court's January 12, 2005 judgment, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

On November 10, 1914, a testamentary trust was created by the Last Will and Tes-

---

1. The Honorable Colleen K. Hirai presided.

tament of Samuel M. Damon ("Trust"). Samuel M. Damon died on July 1, 1924.

During the 1999–2003 accounting period, the Trustees managed the Trust's assets with roughly half of its value in publicly traded securities and the other half in real estate. The securities portion of the Trust's assets consisted mostly of a 13% interest in BancWest Corporation[2] common stock. The real estate portion of the Trust's assets consisted primarily of prime industrial and commercial lands in Honolulu under long-term leases, a sizeable cattle ranch on the island of Hawai'i, two walnut ranches located in California, and an industrial property located in California.

In 2001, the Trust sold its entire 13% interest in BancWest Corporation common stock. In 2003, the Trust sold its prime industrial and commercial land in Honolulu, two walnut ranches, and a significant portion of real estate located on the island of Hawai'i. The net proceeds from these transactions has been reinvested into a diversified securities portfolio that is being advised and managed by Goldman, Sachs & Company.

## B. Procedural Background

The relevant procedural background for this case is as follows. On April 30, 2004, the Trustees filed the Petition in Equity No. 2816–A and Probate No. 6664.

On May 4, 2004, the probate court filed an order appointing James Kawachika, Esq. as Master for the Petition. The probate court's order was filed pursuant to an "Amended Order of Pre–Petition Reference," which was filed on July 17, 2003, and stated that Kawachika "shall be appointed as Master for the petition and respond thereto, upon the filing of the petition."

On August 3, 2004, Haig filed a "Response" to the Petition. Therein, Haig raised several concerns, which included having "not been provided with a disclosure of potential or actual conflicts of interest as required by a formal written conflict of interest policy" that was ordered by the probate

court in its amended "Order Granting Petition for Approval of Income and Principal Accounts for the Period January 1, 19[ ]95 through December 31, 1997[.]" Haig also contended that "[t]he duty of the beneficiary requires a comprehensive legal review of potential or actual conflicts of interest … so they can be reported and resolved in a formal manner pursuant to" the probate court's amended order.

On November 3, 2004, the Master filed his "Report of Master On Petition For Approval Of 1999, 2000, 2001, 2002, and 2003 Income and Principal Accounts." In his report, the Master stated, *inter alia,* that "[w]hile no interested person has directly raised an issue regarding the implementation of the Trust's conflicts of interest policy, your Master independently does so now." The Master then expressed his "concern about the manner in which the Trustees' individual conflicts of interest are identified, disclosed, resolved and reported."

On November 23, 2004, Haig filed a "Response" to the Master's report for approval of the Petition. In his response, Haig disagreed with the Master's statement that "no interested person has directly raised an issue regarding the implementation of the Trust's conflicts of interest policy[.]" Additionally, Haig asserted that the Trustees and Master failed "to disclose a potential conflict of interest arising from the appointment of the Master," inasmuch as the Master's law firm represented the Trustees in two lawsuits "involving leases in the Mapunapuna properties" while the instant Petition was being considered by the probate court. Because Haig believed that the Master's law firm's representation of the Trustees manifested a conflict of interest, Haig asserted at a hearing held on December 17, 2004, that the "conflict of interest should disqualify the [M]aster from serving further in this matter."

On January 12, 2005, the probate court filed its "Order Granting Petition For Approval Of 1999, 2000, 2001, 2002, and 2003 Income and Principal Accounts." Therein,

---

**2.** BancWest Corporation was formed as a result of the 1998 merger between First Hawaiian, Inc. and Bank of the West.

the probate court, *inter alia*, granted the "Accounts Petition ... as recommended in the Master's Report, which is approved and adopted[.]" Additionally, the probate court made the following pertinent conclusions:

2. All requests for instructions, requests for determinations, and objections raised in response to the Accounts Petition, including with respect to an alleged potential conflict of interest by the Master, have been reviewed by the [probate court] and are rejected and denied, except as set forth in paragraph 4 below;

. . . .

4. As recommended by the Master, the Trustees are instructed to consider[ ] and consult with the Beneficiaries regarding, whether the Damon Estate's Conflicts of Interest Policy should be amended and implemented in the following respects:

a. To provide that all conflicts of interest disclosures and the resolution of the same be fully reported in the Minutes of the Trustees' meeting; and

b. To provide that in the written disclosures of any conflict of interest, the Trustees may, in their absolute discretion and if they deem it to be prudent and advisable to do so, withhold from disclosing any sensitive or confidential information about pending Trust matters;

5. As recommended by the Master, the Trustees are cautioned to be more circumspect in the waiver of disclosed conflicts of interest of any Trustee, especially where a Trustee may be an officer or director of the corporation or entity which is doing business, or proposes to do business, with or is otherwise negotiating with the Trust or on the Trust matters.

Judgment was filed on the same day.

On February 11, 2005, Haig timely filed his notice of appeal.

## II. STANDARD OF REVIEW

■ A probate court has discretion to "appoint a master to review any petition or dispute before the court and to report the recommendations of the master to the court." HPR Rule 28(a) (2004) ("The court *may* ap-

point a master to review any petition or dispute before the court and to report the recommendations of the master to the court." (Emphasis added.)). Accordingly, a probate court's appointment of, and subsequent refusal to disqualify, a master is reviewed under the abuse of discretion standard. *See TSA Int'l Ltd. v. Shimizu Corp.*, 92 Hawai'i 243, 252, 990 P.2d 713, 722 (1999) (stating that this court has "adopt[ed] the abuse of discretion standard for reviewing a judge's denial of a motion for recusal or disqualification" (Block format and citation omitted.)). An abuse of discretion occurs where the probate court "bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (quotation marks and citation omitted).

## III. DISCUSSION

**A. Notwithstanding Haig's Technical Non-compliance with Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(D), We Will Consider the Merits Of His Conflict Of Interest Argument.**

■ Preliminarily, the Trustees assert that Haig's points of error are in non-compliance with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (2005) because they do not cite to where in the record the alleged error was objected to, and, where appropriate, include a quotation of the objection to the Master's report. The Trustees further assert that, in light of these errors, this court need not consider the merits of Haig's arguments, and should consequently affirm the probate court's judgment.

Haig's "STATEMENT OF POINTS ON APPEAL" merely quotes, with a single record citation to, six conclusions of the probate court that he is assigning as error, as follows:

1. The Probate Court erred in finding:

"... The Court hereby enters this Order Appointing Master and Appoint James Kawachika, Esq. as the Master for the Petition who shall respond to such Petition, in accordance with the further order of the Court." (4 May 2004) R. at P.V. 14, pp. 3–4.

2. The Probate Court erred in finding:

"All requests for instructions, requests for determinations, and objections raised in response to the Accounts Petition, including with respect to an alleged potential conflict of interest by the Master, have been reviewed by the Court and are rejected and denied, except as set forth in paragraph 4 below ..." R. at P.V. 16, pp. 96–100.

3. The Probate Court erred in finding:

"The Accounts Petition is granted, as recommended in the Master's Report, which is approved and adopted, and the Response of the Guardian Ad Litem, which is approved and adopted to the extent that it is consistent with the Master's Report ..." R. at P.V. 16, pp. 96–100.

4. The Probate Court erred in finding:

"The income and principal accounts and inventory of the Samuel Mills Damon Estate are settled, allowed and approved for the calendar years 1999, 2000, 2001, 2002, and 2003 ..." R. at P.V. 16, pp. 96–100.

5. The Probate Court erred in finding:

"As recommended by the Master, the Trustees are instructed to consider[ ] and consult with the Beneficiaries regarding, whether the Damon Estate's Conflicts of Interest Policy should be amended and implemented in the following respects:

a. To provide that all conflicts of interest disclosures and the resolution of the same be fully reported in the Minutes of the Trustees' meeting; and

b. To provide that in the written disclosures of any conflict of interest, the Trustees may, in their absolute discretion and if they deem it to be prudent and advisable to do so, withhold from disclosing any sensitive or confidential information about pending Trust matters ..." R. at P.V. 16, pp. 96–100.

6. The Probate Court erred in finding:

"As recommended by the Master, the Trustees are cautioned to be more circumspect in the waiver of disclosed conflicts of interest of any Trustee, especially where a Trustee may be an officer or director of the corporation or entity which is doing business, or proposes to do business, with or is otherwise negotiating with the Trust or on the Trust matters." R. at P.V. 16, pp. 96–100.

HRAP Rule 28(b)(4)(C) and (D) instructs that the opening brief "shall" contain:

(4) A concise statement of the points of error set forth in separately numbered paragraphs. Each point *shall* state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) *where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.* Where applicable, each point *shall* also include the following:

. . . .

(C) when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error;

(D) *when the point involves a ruling upon the report of a master, a quotation of the objection to the report.*

(Emphases added.)

All of Haig's points of error do not comply with HRAP Rule 28(b)(4)(iii) inasmuch as they do not state "where in the record the alleged error was objected to...." However, with regard to his first point of error, the required citation is in fact located in his "STATEMENT OF THE CASE" section of his opening brief. Therefore, although the required citation is misplaced, Haig does include a citation to the record showing "where ... the alleged error was objected to[,]" which sufficiently satisfies the requirements of HRAP Rule 28(b)(4)(iii).

With regard to his remaining points of error, Haig also includes a citation to the record showing "where ... the alleged error was objected to[,]" although these citations are also located in the wrong section of his opening brief. *See* HRAP Rule 28(b)(4)(iii); However, Haig's remaining points of error appear to dispute the probate court's approval of the Master's report, inasmuch as his record citation to "R. at P.V. 16, pp. 96–100" is the probate court's "Order Granting Peti-

tion For Approval Of 1999, 2000, 2001, 2002, and 2003 Income and Principal Accounts." Among other things, the probate court's "Order" "approved and adopted" the "Accounts Petition ... as recommended in the Master's Report[.]" As such, Haig's remaining points of error trigger the additional requirement enunciated in HRAP Rule 28(b)(4)(D); namely, "when the point [of error] involves a ruling upon the report of a master, a quotation of the objection to the report" "shall" be included. The required quotations have not been provided for in Haig's opening brief. In fact, in his reply brief, rather than attempt to cure this error that was raised by the Trustees in their answering brief, Haig attempts to justify his non-compliance by stating simply that his objections "were too voluminous to quote but are cited...."

This court has consistently held that failure to comply with the requirements of HRAP Rule 28(b)(4) is alone sufficient to affirm the circuit court's judgment. *Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004). Nonetheless, without expressing an opinion in regard to Haig's third through sixth points of error, his second point of error on appeal appears to raise the same conflict of interest issue as his first point of error. Because this court has "adhered to the policy of affording litigants the opportunity to have their cases heard on the merits, where possible[,]" and the misplaced record citations point to the conflict of interest argument that Haig raised before the probate court, we will consider the merits of this argument. *Id.* at 180–81, 86 P.3d at 989–90 (citation and quotation marks omitted).

**B. The Probate Court Abused Its Discretion By Denying Haig's Request To Disqualify the Master Because It Clearly Erred In Its Assessment Of the Evidence That Indicated That a Conflict Of Interest Existed Between Kawachika and the Trustees.**

**1. *A conflict of interest existed between Kawachika and the Trustees.***

Haig asserts that the probate court erred in denying his request to disqualify Kawachika as the Master of the Petition because a conflict of interest existed between Kawachika and the Trustees. Specifically, Haig asserts that Kawachika should have been disqualified as the Master because of his firm's representation of the Trustees in two unrelated cases while the Petition was pending approval before the probate court.

At a hearing held on December 17, 2004, the probate court determined that, "[b]ased on the circumstances presented, ... no evidence has been presented to demonstrate that the master's impartiality might reasonably be questioned." The probate court reasoned further: "The master ... conducted a thorough and an independent review of the accounts and prepared [his] ... report[ ] that assisted the [probate] court in its review of the petition." Although we do not question Kawachika's performance of his duties as Master, we respectfully disagree with the probate court's assessment of the evidence and its determination that "no evidence has been presented to demonstrate that the master's impartiality might reasonably be questioned."

In *Straub Clinic & Hospital v. Kochi*, 81 Hawai'i 410, 412, 917 P.2d 1284, 1286 (1996), an attorney in the "Torkildson firm" represented Straub, Kapiolani Information Systems, and Infotech in connection with the finalization of a joint venture agreement between these three entities. Eventually, Straub, through the "Torkildson firm," filed a complaint against Peat Marwick, who was engaged as a consultant by Straub and the "Kapiolani entities." *Id.* During the litigation, Peat Marwick filed a third party complaint against, *inter alia*, the "Kapiolani entities." *Id.* at 413, 917 P.2d at 1287. The "Kapiolani entities" then filed a motion to disqualify the "Torkildson firm" from continuing to represent Straub because the "Torkildson firm" had formerly represented the "Kapiolani entities" and had been counsel for them in matters substantially related to the subject matter of the complaint against Peat Marwick. *Id.* This court ultimately held that the circuit court's " 'basis upon which [it] rested its order of disqualification' is not 'clearly insufficient' " inasmuch as the "substantial relationship test" applied, the former representation of the "Kapiolani enti-

ties" by the "Torkildson firm" was "substantially related" to the Peat Marwick litigation, and the "Torkildson firm's" present and former clients were "materially adverse" in that case. *Id.* at 415–17, 917 P.2d at 1289–91 (quoting *Chuck v. St. Paul Fire & Marine Ins. Co.*, 61 Haw. 552, 558, 606 P.2d 1320, 1324 (1980)).

Although the "substantial relationship" test does not apply to this case, *Straub Clinic & Hospital* is similar in principle. Therein, this court discussed thoroughly the distinction between the holding of *Allegaert v. Perot*, 565 F.2d 246 (2d Cir.1977) and HRPC Rule 1.9(a).[3] *Straub Clinic & Hosp.*, 81 Hawai'i at 415–17, 917 P.2d at 1289–91. Pursuant to the *Allegaert* holding, "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Id.* at 415, 917 P.2d at 1289 (quotation marks and citation omitted) (emphasis in original). HRPC Rule 1.9(a), however, affords "broad[er] protections" than the *Allegaert* rule, inasmuch as "Rule 1.9(a), by its terms, is not limited to situations where the former client would be harmed by the possible divulgence of confidential information. It imposes an ethical obligation irrespective of harm." *Id.* at 416, 917 P.2d at 1290 (citing *Koch v. Koch Indus.*, 798 F.Supp. 1525, 1535 (D.Kan.1992) (block format and brackets omitted)).

[R]ules identical with HRPC 1.9(a)[ ] ... prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the

rule is important for the maintenance of public confidence in the integrity of the bar. Finally, and importantly, a client has the right to expect the loyalty of his attorney in the matter for which he is retained. *Id.* (citation omitted). Therefore, by adhering to a standard that prevents the mere "potential" for a breach of a former client's confidences, "Rule 1.9 is designed to address not only the narrow need to protect a client's confidences, but also to establish broader standards of attorney loyalty and to maintain public confidence in the legal system." *Id.* (citation omitted); *see Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980) ("It is the possibility of the breach of confidence, not the fact of breach, that triggers disqualification.").

A similar standard of preventing a mere "potential" of a conflict of interest applies to masters in a probate proceeding. Pursuant to the Hawai'i Probate Rules, a court-appointed master "serve[s] as a representative of the court[,]" Hawai'i Probate Rules (HPR) Rule 28(a) (2004), whose role is to, "[u]nless otherwise ordered by the court, ... review the operations of the fiduciary in light of the terms of the controlling document, as well as the financial transactions of the trust or estate." HPR Rule 29 (2004). Additionally, "the master shall submit a written report of the master's findings to the [probate] court and serve a copy on all interested persons." *Id.* It is in this capacity that the master essentially "serves as the eyes and ears of the court," *id.* cmt., and "shall be a person who has no conflict of interest with any party or issue in the proceeding." HPR Rule 28(a). However, Hawaii's Probate Rules do not indicate which conflict of interest rules would apply to a master in a probate proceeding.[4]

---

3. HRPC Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation."

4. We note that HPR Rule 42 (2004), entitled "Conflicts of interest," explains the attorney-client relationship where the client is a fiduciary for an estate, guardianship, or trust. HPR Rule 42 does not explain the conflict of interest rules applicable to a master, inasmuch as a master

"shall serve as a representative of the court...." HPR Rule 28(a). Contrastingly, the Hawai'i Rules of Professional Conduct (HRPC) provides that "[a] lawyer is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice." HRPC pmbl. (2004).

HPR Rule 42 provides, in its entirety:
(a) *Fiduciary as Attorney's Client.* An attorney employed by a fiduciary for an estate, guardianship, or trust represents the fiduciary as client as defined in Rule 503(a) of the Hawaii Rules of Evidence and shall have all the

Haig suggests that we apply the conflict of interest rules applicable to federal judges, inasmuch as a master has been characterized by the federal courts as "an officer of [the] judicial system [who] perform[s] judicial functions[.]" *Jenkins v. Sterlacci*, 849 F.2d 627, 630 (D.C.Cir.1988) (quoting CODE OF JUDICIAL CONDUCT FOR UNITED STATES JUDGES I–58) (quotation marks omitted). Notwithstanding what the federal courts have held,[5] we believe that the rules

and case law of this jurisdiction are sufficient to adequately address the conflict of interest issue in this case.

■ The section entitled "Application Of the Code Of Judicial Conduct" of the Revised Code of Judicial Conduct (RCJC) (1992) provides, in pertinent part, as follows:

 A. Anyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions, including

---

rights, privileges, and obligations of the attorney-client relationship with the fiduciary insofar as the fiduciary is acting in a fiduciary role for the benefit of one or more beneficiaries or a ward.

 (b) *Relationship to Beneficiaries.* An attorney for an estate, guardianship, or trust does not have an attorney-client relationship with the beneficiaries of the estate or trust or the ward of the guardianship, but shall owe a duty to notify such beneficiaries or ward of activities of the fiduciary actually known by the attorney to be illegal that threaten the security of the assets under administration or the interest of the beneficiaries.

 (c) *Officer of Court.* An attorney for an estate, guardianship, or trust is an officer of the court and shall assist the court in securing the efficient and effective management of the estate. The attorney has an obligation to monitor the status of the estate and to ensure that required actions such as accountings and closing a probate estate are performed timely. The attorney, after prior notice to the fiduciary, shall have an obligation to bring to the attention of the court the nonfeasance of the fiduciary.

 (d) *Sanctions.* The court shall have the power and authority to impose sanctions upon any attorney who fails to properly carry out the attorney's duties to the fiduciary, the beneficiaries or ward, and the court.

(Italics in original.)

5. We note that the federal circuits appear to apply two distinct conflict of interest standards to a court-appointed master. Whether a federal circuit applies either one standard or the other appears to depend on the amount of control that a trial court has in its review of a master's findings.

 On one level, several federal circuits have utilized an "actual bias" standard, as follows: "[D]isqualification [of a special master] is a matter for the exercise of discretion by the [federal] district judge, unless actual bias has been demonstrated beyond reasonable possibility of disagreement." *Rios v. Enter. Ass'n Steamfitters Local Union 638 of U.A.*, 860 F.2d 1168, 1174 (2d Cir.1988) (quoting *United States v. Certain Parcels of Land*, 384 F.2d 677, 681 (4th Cir.1967)) (quotation marks omitted) (brackets added). Under this standard, "[a] balancing of all consider-

ations and probabilities should be the function of the district court and, in review of its action, the test should be whether abuse appears." *Id.* at 1174–75 (quoting *United States v. Lewis*, 308 F.2d 453, 457 (9th Cir.1962)) (quotation marks omitted) (brackets added). The reasoning behind this standard is that "[s]ince masters and experts are subject to the control of the court and since there is a need to hire individuals with expertise in particular subject matters, masters and experts have not been held to the strict standards of impartiality that are applied to judges." *Id.* at 1174 (quoting *Morgan v. Kerrigan*, 530 F.2d 401, 426 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976)) (quotation marks omitted) (brackets added).

 On a separate level, in *Jenkins*, the D.C. Circuit disagreed with *Morgan's* reasoning and determined that, "at least insofar as special masters perform duties functionally equivalent to those performed by a judge, they must be held to the same standards as judges for purposes of disqualification." 849 F.2d at 631 n. 1; *see United States v. Werner*, 916 F.2d 175, 177–79 (4th Cir. 1990) (qualifying its *Certain Parcels of Land* decision in light of an amendment to a federal statute, and using *Jenkins* to explain the disqualification standards enunciated in the statute). The *Jenkins* court's determination appears to be based primarily on (1) the American Bar Association Code of Judicial Conduct for United States Judges, and (2) the fact that the "special master's factual findings ... were reviewed by the district court only for 'clear error,' as required by Rule 53(e)(2) of the Federal Rules of Civil Procedure." *See Jenkins*, 849 F.2d at 630–31.

 Given the complexities of the issues special masters are frequently called upon to sort out, the closely disputed issues of fact they must resolve ..., and the "clear error" standard governing the court's review of their findings, the district court's oversight of a special master falls far short of plenary "control"; there is a range within which a special master's partiality may operate unchecked and uncheckable by the district court.

*Id.* at 631. Because our rules and case law are sufficient to address the conflict of interest issue in this case, we need not express an opinion with regard to the standards used by the federal courts.

an officer such as a magistrate, court commissioner, *special master* or referee, but not including arbitrators, *is a judge within the meaning of this Code. All judges shall comply with this Code except as provided below.*

B. Continuing Part-time Judge. A continuing part-time judge:

(1) is not required to comply

(a) except while serving as a judge, with Section 3(B)(9); and

(b) at any time with Sections 4C(2), 4D(3), 4E(1), 4F, 4G, 4H, 5A(1), and 5B.

(2) shall not practice law in the court on which the judge serves.

C. Time for Compliance. A person to whom this Code becomes applicable shall comply immediately with all provisions of this Code except Sections 4D(2), 4D(3) and 4E . . . .

(Emphases added.) Inasmuch as a "master" falls within the RCJC's definition of a "judge," [6] the conflict of interest rules in the Revised Code of Judicial Conduct applies to masters in a probate proceeding, which provides in part that "[a] judge must avoid all impropriety and appearance[s] of impropriety." RCJC Canon 2(A) cmt.

"[T]here are certain fundamentals of just procedure which are the same for every type of tribunal and every type of proceeding." R. Pound, *Administrative Law* 75 (1942). [ ]Concededly, a 'fair trial in a fair tribunal is a basic requirement of due process.' *In re Murchison*, 349 U.S. 133, 136[, 75 S.Ct. 623, 99 L.Ed. 942] (1955) . . . . Of course, "a biased decisionmaker [is] constitutionally unacceptable[.]" *Id.[, Withrow v. Larkin*, 421 U.S. 35,] at 47[, 75 S.Ct. 623, 99 L.Ed. 942 (Wis. 1975) ] . . . . But "no one would argue seriously that the disqualification of [decisionmakers] on grounds of actual bias . . . prevents unfairness in all cases." *State v. Brown*, 70 Haw. 459, 467, 776 P.2d 1182,

1187 (1989). So "our system of [justice] has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra.*

The Supreme Court teaches us too that justice can "perform its high function in the best way [only if it satisfies] 'the appearance of justice.' *Offutt v. United States*, 348 U.S. 11, 14[, 75 S.Ct. 11, 99 L.Ed. 11] . . . ." *In re Murchison, supra.* For in a popular government, " 'justice must not only be done but must manifestly be seen to be done . . . .' *Rex v. Justices of Bodmin*, [1947] 1 K.B. 321, 325." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 n. 19[, 71 S.Ct. 624, 95 L.Ed. 817] (Frankfurter, J., concurring) (1951).

*Sussel v. City & County of Honolulu Civil Serv. Comm'n*, 71 Haw. 101, 107–08, 784 P.2d 867, 870 (1989) (brackets added and in original) (ellipsis added and in original). Accordingly, "[w]e have held that the test for disqualification due to the 'appearance of impropriety' is an objective one, based not on the beliefs of the petitioner or [adjudicator], but on the assessment of a reasonable impartial onlooker apprised of all the facts." *In re Water Use Permit Applications*, 94 Hawai'i 97, 122, 9 P.3d 409, 434 (2000) (quoting *State v. Ross*, 89 Hawai'i 371, 380, 974 P.2d 11, 20 (1998)) (brackets in original and some quotation marks omitted).

As such, the commentary to Canon 2(A) of the RCJC provides that "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Moreover, pursuant to Canon 3(E)(1) of the RCJC, "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]"

In the instant case, it is undisputed between the parties that, on January 20, 2004, a

---

**6.** Elaborating further on those "who perform[ ] judicial functions[,]" the commentary states that "[t]he categories of judicial service in other than a full-time capacity are necessarily defined *in general terms because of the widely varying forms of judicial service.*" (Emphasis added.) In this connection, and in light of Rules 28 and 29 of the Hawai'i Probate Rules, we do not believe that there is a substantive distinction between a "special master," as that term is used in the Revised Code of Judicial Conduct, and a "master," as that term is used in the Hawai'i Probate Rules.

complaint was filed in civil no. 04–1–0106–01, which is entitled "*Ronald Tadashi Uemura and PH Corporation, dba Hawaii Performance Warehouse and Ron's Performance Center, a Hawaii Corporation v. Estate of Samuel Mills Damon, aka Estate of Samuel M. Damon[.]*"[7] On March 5, 2004, a complaint was filed in civil no. 04–1–0421–03, which is entitled "Island Demo, Inc., a Hawaii Corporation v . . . . Trustees of the Estate of Samuel M. Damon, deceased[.]" Apparently, Kawachika's law firm was "being retained and paid by First Insurance Company of Hawaii, Ltd . . . . to defend its insured, the Estate, in [these] cases." Additionally, the firm "is on the approved panel of attorneys retained by First Insurance and regularly defends insureds of First Insurance." Further, it appears from the record that these cases were being litigated while the Petition was pending approval before the probate court.[8]

The Trustees assert that the Master did not have a conflict of interest because the "Trustees' interests were aligned with the interests of the beneficiaries with respect to the defense of Damon Estate's interests." However, the issue in this case is not whether the Trustees' and beneficiaries' interests are "aligned" with one another, but whether Kawachika's "representa[tion] of the court" as Master of the Petition, *see* HPR Rule 28(a), and his law firm's simultaneous representation of the Trustees in civil nos. 04–1–0106–01 and 04–1–0421–03 constituted a conflict of interest under the Revised Code of Judicial Conduct warranting Kawachika's disqualification as Master of the Petition.

▮ Although a master in a probate proceeding is neither a "decision-maker" nor an "adjudicator," *see Sussel,* 71 Haw. at 107–08, 784 P.2d at 870, a master's role is to assist the probate court in the disposition of the proceeding. *See* HPR Rule 28(a); HPR Rule 29. As such, a master provides, at the

probate court's discretion, *see* HPR Rule 28(a), needed services within "our system of [justice]," which "has always endeavored to prevent even the probability of unfairness." *Sussel,* 71 Haw. at 107, 784 P.2d at 870 (block format and citation omitted). In this regard, " 'justice must not only be done but must manifestly be seen to be done . . . .' *Id.* at 108, 781 P.2d at 870 (block format and citation omitted). For these reasons, a master "shall be a person who has no conflict of interest with any party or issue in the proceeding[,]" HPR Rule 28(a), and, consequently, a master shall be disqualified "in a proceeding in which [his] impartiality might reasonably be questioned[.]" RCJC Canon 3(E)(1).

▮ The Trustees filed the instant Petition on April 30, 2004, which sought the probate court's approval of the 1999, 2000, 2001, 2002, and 2003 income and principal accounts. However, as explained above, while the Petition was pending approval before the probate court, Kawachika's law firm was "being retained and paid by" an insurer "to defend its insured," the Trustees, in civil nos. 04–1–0106–01 and 04–1–0421–03. During the probate proceedings, Kawachika was appointed by the probate court as Master of the Petition. In this capacity, Kawachika's role, "as a representative of the court," HPR Rule 28(a), is to "serve[ ] as the eyes and ears of the court" by objectively "review[ing] the entire scope of the fiduciary's performance during the accounting period pursuant to the governing instrument." HPR Rule 29 cmt. Inasmuch as "our system of [justice] has always endeavored to prevent even the probability of unfairness," *Sussel,* 71 Haw. at 107, 784 P.2d at 870, we hold that Kawachika's law firm's representation of the Trustees in civil nos. 04–1–0106–01 and 04–1–0421–03 while the Petition was pending approval before the probate court "would create in reasonable minds a perception" that

---

7. To reiterate, the Trustees filed the instant Petition on April 30, 2004. On May 4, 2004, the probate court filed an order appointing James Kawachika, Esq. as Master for the Petition.

8. The Trustees admit that Arthur Reinwald of the same law firm represented Haig in the past. However, it does not appear that Haig is assert-

ing that a conflict of interest exists because of Arthur Reinwald's prior representation of him. Instead, he is asserting that a conflict of interest exists because of Kawachika's law firm's representation of the Trustees in two unrelated cases while the Petition was pending approval by the probate court.

Kawachika's "impartiality might reasonably be questioned." [9] RCJC Canon 2(A); RCJC Canon 3(E)(1); *see Sussel*, 71 Haw. at 107–08, 784 P.2d at 870; *see also Straub Clinic & Hosp.*, 81 Hawai'i at 415–17, 917 P.2d at 1289–91. Therefore, the probate court abused its discretion by denying Haig's request to disqualify the Master because a conflict of interest existed between the Master and the Trustees. *See* HPR Rule 28(a).

### 2. *The Trustees' assertions are without merit.*

██ The Trustees also assert that Haig neither (1) made a sufficient objection to the Master's report, (2) "demonstrate[d]" that the Master was "bias[ed], prejudice[d], or partial[ ]," nor (3) filed an "affidavit" for disqualification of the Master. The applicable standard, as discussed above, is as follows: "[T]he test for disqualification due to the 'appearance of impropriety' is an objective one, based not on the beliefs of the petitioner or [adjudicator], but on the assessment of a reasonable impartial onlooker *apprised of all the facts.*" *In re Water Use Permit Applications*, 94 Hawai'i at 122, 9 P.3d at 434 (citation and quotation marks omitted) (brackets in original) (emphasis added).

Prior to July 1, 2004, HPR Rule 3 provided, in pertinent part, as follows:

(a) *Form. There shall be a petition and a response or objection.* For purposes of these rules, an application in an informal proceeding is a petition, unless the context of the rule indicates otherwise. *Persons may file a joinder, response, or objection.* Persons may file a memorandum in support of their pleadings....

(b) *Filings in Response to Petition.* Opposition to any or all of the relief prayed for in a petition shall be in the form of a written objection. Opposition to an application in an informal proceeding shall also be made by filing a petition for formal proceedings. *Interested persons may also file a written response to a petition* if they do not necessarily object to a petition but desire to state on the record their position, or *if they desire to raise additional issues that are related to the petition.*

(Emphases added and italics in original.)

HPR Rule 3 was amended on May 17, 2004, with the amendments becoming effective on July 1, 2004. As amended, the pertinent portions of HPR Rule 3 provides, as follows:

(a) *Form. There shall be a petition and a response or objection.* For purposes of these rules, an application in an informal proceeding is a petition, unless the context of the rule indicates otherwise. *Persons may file a joinder, response, or objection to a petition or to a master's ... report.* Persons may file a memorandum in support of their pleadings....

(b) *Filings in Response to Petition or Master's ... Report.* Opposition to any or all of the relief prayed for in a petition *or to a master's ... report* shall be in the form of a written objection. Opposition to an application in an informal proceeding shall also be made by filing a petition for formal proceedings. *Interested persons may also file a written response to a petition or to a master's ... report* if they do not necessarily object to a petition *or to a master's ... report* but desire to state on the record their position, or *if they desire to raise additional issues that are related to the petition or to the master's ... report.*

(Emphases added and italics in original.)

On November 23, 2004, Haig filed a "Response ... To Report Of Master On Petition For Approval Of 1999, 2000, 2001, 2002, and 2003 Income and Principal Accounts." Therein, Haig brought to the probate court's attention facts pertinent to Kawachika's law firm's representation of the Trustees in civil nos. 04–1–0106–01 and 04–1–

---

9. Both before the probate court and on appeal, the Trustees aver that, during the "pre-Petition stage" in 2003, an "ethical wall" was "erected between the Master and other members of his firm with respect to Damon Estate matters." However, as expressed by this court in *Otaka, Inc. v. Klein*, 71 Haw. 376, 387 & n. 4, 791 P.2d 713, 719 & n. 4 (1990), "[w]e do not think the 'Chinese wall' defense to law firm disqualification is applicable" in a case such as this where, "[o]nce the attorney is found to be disqualified ..., both the attorney and the attorney's firm [must be] disqualified...." (Brackets omitted and in original.).

0421–03. Because of these facts, Haig asserted that the Master had a conflict of interest with the Trustees. Therefore, contrary to the Trustees' assertion that Haig failed to "demonstrate" that the Master was "bias[ed], prejudice[d], or partial[ ]," Haig has alleged sufficient facts for a "reasonable impartial onlooker" to reach a determination regarding whether a conflict of interest existed between Kawachika and the Trustees. *See In re Water Use Permit Applications,* 94 Hawai'i at 122, 9 P.3d at 434.

 Additionally, although Haig did not file an "affidavit" to disqualify the master, HPR Rule 3(b) provides that an "interested person" may file a "response" "to raise additional issues that are related to the petition." A master's impartiality is clearly an issue that would be "related to . . . the master's . . . report." *See* HPR Rule 3(b). Inasmuch as Haig's objection was included in his "response" to the Master's report, Haig was essentially asserting that the probate court should not accept the Master's report because the Master had a conflict of interest with the Trustees.[10] *See* HPR Rule 28(a) ("The master . . . shall be a person who has no conflict of interest with any party or issue in the proceeding."); HPR Rule 3(b). Logically, the Master would have been disqualified had the probate court concluded that a conflict of interest existed. *See* HPR Rule 28(a). Therefore, the Trustees' assertions that Haig neither made a sufficient objection nor filed an "affidavit" for disqualification are without merit.

3. *Haig's conflict of interest argument was timely made.*

 The Trustees assert that Haig's conflict of interest argument is untimely because (1) six months elapsed between his objection and the time that he was informed of the Master's law firm's representation of the Trustees, and (2) his objection was made only after the Master filed his report and "conducted several months of investigation." The Trustees contend that a May 7, 2004 letter that contained the "Minutes of Trustees'

Meetings," which were held on numerous days, "noted that First Insurance had retained Mr. O'Conner[, who is an attorney in Kawachika's law firm,] to defend the Estate."

Haig responds that the Trustees' purported notification through the May 7, 2004 letter is insufficient to constitute notice. Haig also contends that the earliest day that he was sufficiently notified of Kawachika's law firm's representation of the Trustees was by a letter dated November 17, 2004, or five days before he filed his "response" to the Master's report. In this November 17, 2004 letter, Kawachika, in response to a prior letter sent by Haig, informed Haig of civil nos. 04–1–0106–01 and 04–1–0421–03.

 This court has held that "[a] party asserting grounds for disqualification must timely present the objection, either at the commencement of the proceeding or as soon as the disqualifying facts become known." *In re Water Use Permit Applications,* 94 Hawai'i at 122, 9 P.3d at 434. *Further to* this point, "[t]he unjustified failure to properly raise the issue of disqualification . . . forecloses any subsequent challenges to the decisionmakers' qualifications on appeal." *Id.*

Assuming *arguendo* that the May 7, 2004 letter is sufficient to constitute notice of "the disqualifying facts[,]" the facts of this case do not indicate that the timing of Haig's objection constituted "a matter of deliberate and strategic choice." *See id.* at 123, 9 P.3d at 435 ("Despite its awareness of Wilson's dual status, WWCA, apparently as a matter of deliberate and strategic choice, never sought Wilson's disqualification. WWCA cannot now raise the matter as grounds for overturning the Commission's decision."). Indeed, "[t]he requirement of timeliness prohibits knowing concealment of an ethical issue for strategic purposes." *Id.* (citation and quotation marks omitted).

In this case, Haig filed his "response" to the Master's report on November 23, 2004, which included his conflict of interest objection. Both the Master and the Trustees filed, on December 7, 2004, a "reply" that

---

10. We note that both the Master and the Trustees filed, on December 7, 2004, a "reply" to the "responses" to the Master's report. Therein, both the Master and the Trustees rebutted Haig's conflict of interest argument.

**512**

responded to Haig's conflict of interest objection. At a hearing held on December 17, 2004, the probate court considered the conflict of interest arguments and responses made by each party. On January 12, 2005, the probate court filed its order granting the Petition and denying Haig's conflict of interest objection. In light of the procedural history of this case, we cannot say that "knowing concealment" occurred. *See Office of Disciplinary Counsel v. Au,* 107 Hawai'i 327, 339, 113 P.3d 203, 215 (2005) ("Litigants cannot take the heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them." (Citation and quotation marks omitted.)).

Finally, on July 17, 2003, Kawachika's appointment as Master was conditioned by the probate court "upon the filing of the [P]etition." Civil nos. 04–1–0106–01 and 04–1–0421–03 were filed on January 20, 2004, and March 5, 2004, respectively. The Petition was filed on April 30, 2004. At the earliest, the Trustees admit that the "disqualifying facts" of Kawachika's law firm's representation of the Trustees in civil nos. 04–1–0106–01 and 04–1–0421–03 became known to Haig on May 7, 2004, which is three days *after* the probate court filed its order appointing Kawachika as Master of the Petition.

Although Haig made his objection after both the probate court's May 4, 2004 order appointing Kawachika as Master and the Master's completion and filing of his report, the "disqualifying facts" must have been known to Kawachika's law firm prior to the filing of both the Petition and the May 4, 2004 order. Yet, these facts were not disclosed to Haig until after the probate court filed its order appointing Kawachika as Master of the Petition. Consequently, we also cannot say that Haig "knowingly concealed" his objection for "strategic purposes" in order to disqualify the Master as a "heads-I-win-tails-you-lose position[.]" *See id.; In re Water Use Permit Applications,* 94 Hawai'i at 123, 9 P.3d at 435.

## IV. CONCLUSION

Although we do not question Kawachika's capability to effectively perform his responsibilities as Master of the Petition, for reasons discussed above, the facts of this case reasonably give rise to a perception that Kawachika's impartiality might reasonably be questioned. Therefore, based upon the foregoing analysis, we vacate the probate court's January 12, 2005 judgment, and remand for further proceedings consistent with this opinion.[11]

---

**11.** In light of the foregoing disposition, consideration of Haig's remaining points of error is un-necessary.